**BELL HELICOPTER COMPANY, a Division of Textron, Inc., Appellant,**

v.

**Phil BRADSHAW, Sr., Maurice Hunsaker, Joe Ingle d/b/a Coastal Helicopters and Joe Smith, Appellees.**

No. 1424.

Court of Civil Appeals of Texas, Corpus Christi.

Dec. 28, 1979.

Rehearing Denied Feb. 14, 1980.

520

Edward P. Fahey, Thomas H. Crofts, Jr., Groce, Locke & Hebdon, San Antonio, for appellant.

David L. Perry, William R. Edwards, Edwards & Perry, George W. Shaffer, Mahoney, Shaffer, Hatch & Layton, Charles R. Cunningham, Howard F. Sudduth, Corpus Christi, S. Benton Davies, Jr., Guy P. Allison, Allison & Davies, San Antonio, Guy H. Allison, Corpus Christi, for appellees.

## OPINION

BISSETT, Justice.

This case involves an appeal from a judgment for the plaintiffs in a jury tried products liability action brought after the July 20, 1975, crash of a helicopter. Plaintiffs Phil Bradshaw, Sr., and Maurice Hunsaker, who were passengers on the ill-fated helicopter, brought suit against Bell Helicopter Company, the original manufacturer and seller of the craft, for personal injuries under negligence and strict liability; against Joe Ingle, individually and d/b/a Coastal Helicopters, the owner of the helicopter, for negligence; against Joe Smith, the pilot at the time of the accident, for negligence; and against R. J. Monahan Helicopter Service, a helicopter service and repair facility, under strict liability. Defendants Ingle and Smith, in turn, brought cross actions against Bell for damage to the helicopter and personal injuries, respectively. All defendants sought contribution and indemnity from each other. At the conclusion of a month long trial, the cause was submitted to the jury on 101 special issues. Based upon the jury's findings, the trial court rendered judgment that:

(1) plaintiffs Bradshaw and Hunsaker take nothing against the defendant R. J. Monahan Helicopter Service Company;

(2) plaintiff Bradshaw recover $1,059,-404.35 against the defendants Bell, Ingle and Smith;

(3) plaintiff Hunsaker recover $2,531,-714.43 against the defendants Bell, Ingle and Smith;

(4) Defendants Ingle and Smith receive full indemnity from defendant Bell for any damages recovered against them by plaintiffs Bradshaw and Hunsaker;

(5) Ingle, as a cross-plaintiff, recover the sum of $116,461.68 against Bell;

(6) Smith, as a cross-plaintiff, recover the sum of $12,633.90 against Bell.

Bell has appealed. Seventy-nine (79) points of error are presented by Bell. Ingle and Smith were found by the jury to have been negligent in several respects concerning maintenance and operation of the tail rotor blades of the helicopter. These findings are not attacked in this appeal. The parties will henceforth be referred to either as "plaintiffs" or "defendants," as they were in the trial court, or by name.

## I  JURISDICTION OF THE APPEAL

Prior to a discussion of the relevant facts in this case, we deem it necessary to address the challenge made by plaintiffs and cross-plaintiffs, wherein they contend that Bell failed to timely file its appeal bond and thereby failed to perfect its appeal, which, if true, would require this Court to dismiss the appeal of Bell for want of jurisdiction. *Texas Employers' Insurance Association v. Martin*, 162 Tex. 376, 347 S.W.2d 916 (1961); *Martinez v. Euler*, 524 S.W.2d 814 (Tex.Civ.App.—Corpus Christi 1975, no writ).

The relevant procedural history of this case began May 15, 1978, when the trial court rendered its final judgment. Bell then filed its original motion for new trial on May 25, 1978, and its amended motion for new trial on June 14, 1978. The next day, June 15, 1978, a Rule 329b(3), T.R.C.P., agreement extending time for determination of the amended motion for new trial to a date certain was signed by all the parties

to the original action except Monahan, against whom a take nothing judgment had been rendered. Subsequently, on August 10, 1978, an order overruling Bell's amended motion for new trial was signed by the trial judge. Bell then filed its appeal bond on September 8, 1978.

Plaintiffs' argument is that, without Monahan's signature, the agreement to extend time for determination of the amended motion for new trial was invalid, and in the absence of a valid extension agreement, Bell's amended motion for new trial was overruled by operation of law on July 29, 1978. In such event, Bell's appeal bond was due to be filed no later than August 28, 1978. The issue raised by this contention is whether Monahan was one "of the parties in the case" whose signature is required for an effective agreement to extend the time for determination of an amended motion for new trial under T.R.C.P. 329b(3).

The meaning of Rule 329b in its reference to "parties in the case" appears to be an issue of first impression in this State.[1] The Rule, in pertinent part, provides:

"3. All motions and amended motions for new trial must be determined within not exceeding forty-five (45) days after the original or amended motion is filed, unless by one or more successive written agreements of *the parties in the case* filed with the clerk of the court the decision of the motion is postponed to a day certain specifically set out in any such agreement. Any such day certain shall not be more than ninety (90) days after such original or amended motion is filed. (Emphasis added)"

The essence of plaintiffs' contention that Monahan was a party "in the case" at the time the agreement was signed rests upon the assumption that a party "in the case" should logically mean a party litigant over whom the trial court retains jurisdictional power to affect such party's rights in the

---

1. A motion to dismiss this appeal was filed by plaintiffs and cross-plaintiffs which we overruled. The movants then filed an original pro-ceeding by way of mandamus in the Supreme Court. Leave to file was refused.

concerned case. Following this line of reasoning, they argue that, at the time the agreement was signed, there had been no order of severance as to Monahan and, consequently, the trial court retained jurisdiction to grant a new trial as to all the parties, including Monahan. They further argue that this Court, if it has jurisdiction of the appeal, has jurisdiction to reverse Monahan's favorable judgment if it determines that the rights of the appealing and non-appealing parties are sufficiently interwoven and dependent on each other.

In their motion for final judgment on the verdict, plaintiffs did not request the court to enter judgment against Monahan. Accordingly, the trial court entered a take nothing judgment in favor of Monahan. Understandably, Bell's motion for new trial did not complain of anything regarding Monahan. We think it only natural that Bell did not consider Monahan to be a necessary party to any agreement to extend time for considering Bell's motion for new trial. Such motion was directed solely to those parties of which Bell had standing to complain. We hold that Monahan was not one of the "parties in the case" for purposes of the extension agreement. To hold otherwise would create a serious injustice. We consider the rule to be that a Rule 329b(3) extension agreement need only be signed by those parties seeking a new trial and those parties against whom the movants have a right to complain in the motion for new trial, and against whom complaint is actually made. Plaintiffs' and cross-plaintiffs' challenge to the jurisdiction is overruled.

## II  THE EVIDENCE GENERALLY

The helicopter in question was acquired by Houston Helicopters, an authorized Bell service station, in 1969. It was purchased by Ingle from Houston Helicopters in 1973. On July 20, 1975, Bradshaw engaged Ingle to furnish a helicopter and pilot to fly Hunsaker and him to Freer, Texas, for an aerial survey of a 72,000 acre ranch nearby. Smith, an employee of Ingle and a licensed helicopter pilot, piloted the helicopter in question from Ingle's premises in Corpus Christi to a highway intersection near the ranch where he picked up Bradshaw and Hunsaker, and proceeded to fly over the ranch. During the helicopter's return flight one of its tail rotor blades broke off. The failure and loss of the tail rotor blade resulted in the additional loss of the tail rotor hub and gear box, all of which caused a shift in the helicopter's center of gravity and loss of directional control. As a result, the helicopter began to spin clockwise with its nose down. Smith, in an emergency maneuver, cut power to attempt an autorotative landing, which is a power-off, or dead-stick descent, but with little success. The helicopter crashed. Smith, Bradshaw and Hunsaker suffered severe injuries.

At all times pertinent to this appeal, the helicopter in question was equipped with type 102 tail rotor blades. The 102 design had been manufactured and distributed by Bell since the 1950's. The particular 102 tail rotor blade which broke on the day in question had been manufactured by Bell sometime prior to 1970.

When Bell originally sold the helicopter in question in 1961, the 102 blade represented the most advanced state of the art in tail rotor blade technology. It had a designed service life of 600 hours where the use of the helicopter was commercial and not military. In the case at bar, the evidence shows that the 102 blade which broke had been in use for more than 600 hours.

The 102 tail rotor blade in commercial use had a history of in-flight fatigue fracture failures. There was evidence that even one failure communicated to Bell would have constituted notice to Bell of a safety problem. Most of these in-flight fatigue fracture failures were chiefly attributable to failure by the respective owners and operators to comply with Bell suggested, and FAA mandated, inspection and maintenance requirements.

Inspections required of the 102 type tail rotor blade were numerous and detailed. A daily inspection was required by FAA before the first flight of each day and after each refueling. The scope of this inspection was intended to discover fatigue cracks and

thereby prevent failure of tail rotor blades due to such cracks.

There was expert testimony at the trial that the fatigue fracture in question began as a crack in the blade along its trailing edge, within the area of required inspection. The crack was caused by a nick or ding in the blade which produced higher stresses than the metal configuration could withstand. Approximately 90 minutes prior to ultimate failure, the crack was ⁸/₁₀'s of an inch in length and should have been detected by an inspection by Smith, although earlier testimony by the same witness indicated that the crack was only ³/₁₀'s of an inch in length.

The fact that required inspections and maintenance of the 102 blades by the owners and operators of helicopters were not being done was known to Bell prior to the year 1970. The record shows that the 102 blade was considered safe when used commercially, provided the required inspections were done and replacement of the blade was made after 600 hours of operation. Such blades were not safe, however, if the required inspections and replacements were not made. This prompted Bell to begin designing an improved blade in the late 1960's; the result was a new (117 type) tail rotor blade, which became commercially available in 1970. Where the use was commercial, the 117 type blade was more damage tolerant than the 102; it had a service life of 2500 hours, rather than 600 hours; and it required less routine inspection than did the 102.

The 117 tail rotor series was the subject of debate throughout the industry in the early 1970's. As soon as it became commercially available, Bell began to install the 117 system on all new production Model 47 helicopters. No one has ever heard of a 117 blade failing in flight. For this reason, plus the fact that 102 blades were not being inspected as required, the FAA and Bell supported a mandate replacement of all 102

blades with 117 blades prior to the accident in question. The Helicopter Association of America, however, opposed the move, and an Airworthiness Directive Note (AD note) by the FAA, which would have required the substitution of 117 blades for 102 blades, was rescinded.

Prior to the date of the accident in question, Bell distributed to owners and operators on its mailing list information regarding the availability of the 117 tail rotor blade. Ingle was on this list of known owners. Generally, when a person purchases a Bell helicopter, he acquires the right to receive all relevant literature from Bell, including service bulletins, safety notices and revisions of maintenance and flight manuals.

The evidence indicates that before the accident in question Ingle decided, based upon information from Bell, to maintain his Model 47–G2–A1 helicopter with a 102 system rather than to replace it with a 117 system. The 117 blade itself was not interchangeable with the 102 blade.[2]

Bell did not have the legal power to force owners of Bell helicopters to replace their 102 systems with 117 systems. Only the FAA has such power and it chose not to exercise its authority when it decided to rescind the proposed AD note which would have mandated the replacement of all 102 systems with 117 systems. As a practical matter, however, Bell had the means to remove 102 blades from the market, as is evidenced by the steps it took immediately following the accident in question.

After the accident in the case at bar, Bell issued a service bulletin requiring replacement of all 102 systems with the 117 systems on all 47–G2–A1 helicopters. It also issued an information letter to all model 47 operators explaining *increased safety* as well as decreased cost as advantages to updating their tail rotor configurations to the new and improved 117 system. The practical effect of Bell's actions was the

---

**2.** Before 117 blades could be substituted for 102 blades, other parts of the tail rotor system had to be changed as well. For this purpose, Bell offered owners a modification kit which

could be installed at a cost of approximately $2,700.00. In the long run, the 117 was a more economical blade because of its longer service life.

removal of the 102 blade type from the market after 1976, insofar as the model 47–G2–A1 is concerned.

All Bell service stations, including Houston Helicopters, were obligated to adhere to Bell-issued service bulletins. There was evidence that Bell was of the opinion, prior to 1973, that the 117 system should be substituted for the 102 system for the reason of increased safety. Besides the fact that Bell supported adoption of the proposed AD note mandating replacement, there was also the testimony of Bell's blade design engineer, its product support engineer, and its official spokesman and chief pilot, all of whom were of the same opinion, that the 117 rotor series should have replaced the 102 rotor series system. Bell's product support engineer testified that safety required the replacement of all 102 systems as early as 1970. He further testified that this was Bell's opinion as well.

## III  THE AUTOROTATION LANDING

Autorotation is a power-off, or dead-stick, landing. According to Buyers, the chief pilot for Bell, the purpose of autorotation is to provide a means of landing the helicopter safely in the event of engine or tail rotor blade failure.

The inability of the helicopter in question to autorotate on the day of the accident was due, not to the failure of the tail rotor blade to rotate, but to the shift in the center of gravity and loss of directional control caused by the falling-off and loss of the tail rotor hub and gear box. That such loss was a likely consequence of an in-flight tail rotor failure was acknowledged by Bell's chief pilot. This was not indicated in the flight manual, although Buyers, the chief pilot, testified that autorotation in the event of such a loss would be different from a simple autorotative landing. He testified that if a gear box is lost, the pilot will have to shoot from the hip. Under the circumstances, when the gear box fell from the helicopter, it became impossible for Smith to make an autorotative landing in the manner prescribed by Bell in its manual.

## IV  STRICT LIABILITY OF BELL

In its answers to special issues 1 through 6, hereinafter referred to as the "mere presence" issues, the jury found that the presence of the 102 series tail rotor system (the 102 system), instead of the 117 tail rotor system (the 117 system), on the helicopter in question on July 20, 1975, rendered the helicopter unreasonably dangerous to Bradshaw, Hunsaker, Smith and Ingle, and that such condition was a producing cause of the accident. Bell attacks these findings and the judgment against it under strict liability by numerous points of error. In points 1, 2, 6 and 7 Bell asserts that the trial court erred in rendering judgment against it on the theory of strict liability because there are no findings or evidence that the helicopter (or any part or system thereof) was defective and unreasonably dangerous at the time it was manufactured and sold by Bell, and that there is no evidence that the mere presence of the 102 system, instead of the 117 system, rendered the helicopter, at any time, unreasonably dangerous. In points 4 and 9, Bell seeks a remand of the judgment against it on the grounds that the evidence is factually insufficient to support a finding that the helicopter (or any system or part thereof) was defective or unreasonably dangerous at the time it was manufactured and sold by Bell. Bell, in point 5, also complains of the trial court's failure to submit issues inquiring whether the tail rotor blade was defective and unreasonably dangerous at the time it was sold or manufactured by Bell. In point 8, Bell says that it was error to submit special issues 1, 3 and 5, which inquired as to whether the mere presence of the 102 system rendered the system unreasonably dangerous because the issues do not inquire whether the system was defective at the time it was manufactured and sold by Bell.

■ Recovery in Texas under strict liability for harm caused by defective and unreasonably dangerous products is governed by Section 402A of the Restatement, Second of Torts, which was adopted by the Supreme Court in *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.Sup.1967). It reads:

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

As construed by the Supreme Court, Section 402A allows recovery where plaintiff was injured because of a defective condition in the product when it left the hands of the manufacturer or seller. *Turner v. General Motors Corporation*, 584 S.W.2d 844 (Tex. Sup.1979); *Pittsburg Coca-Cola Bottling Works of Pittsburg v. Ponder*, 443 S.W.2d 546 (Tex.Sup.1969); *Jack Roach-Bissonnet, Inc. v. Puskar*, 417 S.W.2d 262 (Tex.Sup. 1967). See also *Miller v. Bock Laundry Machine Company*, 568 S.W.2d 648 (Tex. Sup.1977); *General Corporation v. Hopkins*, 548 S.W.2d 344 (Tex.Sup.1977); *Technical Chemical Company v. Jacobs*, 480 S.W.2d 602 (Tex.Sup.1972). Regardless of how it is manifested, the concept of defect is central to a products liability action brought on a strict liability theory. *Turner v. General Motors Corporation*, supra.

█ Where the alleged defect has resulted from a conscious design choice, in order to hold the manufacturer liable under the theory of strict liability, the trier of fact must first determine whether the product was in an unreasonably dangerous condition when sold. *Miller v. Bock Laundry Ma-* *chine Company*, supra; *Pittsburg Coca-Cola Bottling Works of Pittsburg v. Ponder*, supra; *Hamilton v. Motor Coach Industries, Inc.*, 569 S.W.2d 571 (Tex.Civ.App.—Tyler, 1978, no writ); *Gravis v. Parke-Davis & Co.*, 502 S.W.2d 863 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.). However, it is not necessary that the ultimate "unreasonably dangerous" condition exist at the time the manufacturer or supplier surrenders possession and control of a product (in which change will occur, or in which the change can be anticipated to occur so as to cause a product failure). If a manufacturer or supplier places into the channels of trade a product so fragile that anticipated use is likely to create a dangerous condition, he has distributed an unreasonably dangerous product. *Hamilton v. Motor Coach Industries, Inc.*, supra; *Sharp v. Chrysler Corporation*, 432 S.W.2d 131 (Tex.Civ.App.— Houston [14th Dist.] 1968, writ ref'd n. r. e.).

██ The threshold question in the case at bar is the identity of the product being litigated. Under strict liability, violation of a seller's duty involves only a specific product. The litigation issue is limited to the specific product and its condition when sold. *Gonzales v. Caterpillar Tractor Company*, 571 S.W.2d 867 (Tex.Sup.1978); Green, Strict Liability Under Sections 402A and 402B: A Decade of Litigation, 54 Tex.L. Rev. 1185 (1976). The "mere presence" special issues submitted to the jury in this case identified the product as the 102 series system. We think that Bell's suggested characterization of the product as being merely the blade which broke is artificial and of little analytical value. Likewise, we consider plaintiffs' broad characterization of the product as including not only the blade and helicopter, but also all relevant product information accompanying a sale of the helicopter to be equally artificial and wholly improper from a dispositive viewpoint. Instead, the product about which we are concerned can only be that which was inquired about by the "mere presence" issues: "the 102 series system." That system failed to perform on the day in question.

Once the product is identified, it is then incumbent upon the user or consumer to show the unreasonably dangerous condition of that product. *Turner v. General Motors Corporation*, supra. The Supreme Court, in both *Hopkins* and *Turner*, held that the task of determining whether a product is "unreasonably dangerous" is, and always has been, a process of balancing the product's risk against its utility. This balancing process must take into account even admittedly outright abuses or misuses of the product provided such use is reasonably foreseeable to the manufacturer or supplier.

In the case at bar, there was testimony by expert personnel with Bell that as early as 1968, Bell came to the opinion that the 102 system should be replaced as a result of information that the 102 type blade was subject to in-flight fatigue fracture failure. Admittedly, most of the documented failures between 1968 and 1976, including the accident in question, were, largely the result of operator abuse or misuse. Such abuse was common. It was fully known to Bell (which immediately initiated the design of the new 117 system, the purpose of which was to diminish the frequency or chance of fatigue failures due to operator mishandling.) The 117 system became commercially available in 1970. The existence and availability of this superior alternative rotor 117 system, together with Bell's knowledge that mishandling of the 102 type blade was occurring with alarming frequency in the field and was causing catastrophic accidents, was sufficient evidence for the jury to have found that, after 1970, the presence of 102 systems rendered helicopters like Ingle's unreasonably dangerous.

Bell relies upon *Henderson v. Ford Motor Company*, 519 S.W.2d 87 (Tex.Sup. 1975) and *Weakley v. Fischbach & Moore, Inc.*, 515 F.2d 1260 (5th Cir. 1975) for the proposition that liability cannot be predicated upon the bare criticism that a design could be better or the mere alternative of a safer design. In the present case, however, the evidence amounts to substantially more than bare criticism or merely safer alternatives. Rather, the evidence establishes an actual alternative design which was demonstrably superior to the 102 system. Moreover, although the evidence is disputed, the jury reasonably could have found that the 102 system was not merely "less safe" than the 117 system, but it was actually dangerous to an unreasonable degree. It must be remembered that the 117 system was designed specifically to solve problems created by such danger.

Bell further argues that holding it liable under strict liability will inhibit and penalize the improvement of product safety. We disagree. We are careful to point out, however, that the 117 system was designed and marketed before the accident in question. We also must emphasize that Bell was not obliged to design the safest possible product, or one as safe as others make, or a safer product than the one it has designed. We merely hold that, once Bell produced a design which was known to be safer, the manufacturer owed a duty to person using its helicopters to refrain from allowing 102 systems to be used.

Not only must a product have been unreasonably dangerous for one to recover under strict liability, it must have been so at the time it left the control of the manufacturer or supplier. *Pittsburg Coca-Cola Bottling Works of Pittsburg v. Ponder*, supra. It has been held, though, in a marketing defect case, that plaintiff need not specifically prove that the defect existed at the time the product left the hands of defendant because the defect alleged, (failure to warn by the manufacturer) is, by definition, dereliction on the part of the manufacturer. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974). The same reasoning also applies to cases involving design defects. Sales & Perdue, the Law of Strict Tort Liability in Texas, 14 Hous.L.Rev. 1, 535–54 (1976).

In the instant case, while Bell lost control of the involved helicopter in 1961 when it was placed in the stream of commerce by sale to a person whose identity was not established, Bell regained a significant degree of control, with respect to the issue of

strict liability, in 1969, when the helicopter was acquired by Houston Helicopters, a Bell service station, and Bell retained such control until the date the helicopter was sold by Houston Helicopters to Ingle in 1973. This is so because of the unique relationship between the service stations and Bell. Although Bell did not possess the actual power of the FAA to require owners to replace the 102 system with the 117 system, as a practical matter, it could accomplish the same result through its service stations. All of Bell service stations were required to adhere to and comply with all Bell-issued service bulletins or safety notices regarding Bell-made component parts, the servicing of same, or the replacement thereof. Had Bell demanded a replacement of the 102 system with the 117 system or delivered an adequate notice concerning the unreasonably dangerous condition of the 102 system during the time the helicopter remained in the possession of Houston Helicopters, the latter would have complied with Bell's directive.

■ The same 102 system, which was on the helicopter in 1973 when it was purchased by Ingle from Houston Helicopters, was on the helicopter when it crashed in 1975. The jury found that the "mere presence" of the 102 system on the helicopter rendered the helicopter unreasonably dangerous on July 20, 1975, the day of the crash. The same conditions which existed on that date existed with equal vitality on the day it was purchased in 1973 by Ingle from Houston Helicopters. Insofar as the issue of strict liability is concerned, we hold, as a matter of law, that Bell had control of the helicopter on the day that the same was purchased by Ingle, that it lost control at that time, and that it was unreasonably dangerous on the date of sale to Ingle. Therefore, there was no need for any additional jury finding, as insisted by Bell.

Before we complete our discussion on strict liability, we believe that the ultimate decision that we make herein can be better understood by our decision of the evidence on the negligence issues and appellants' points of error concerning them. This is so because the evidence in the record concerning both theories of liability is relevant to the final result.

The jury found that Bell was negligent in: 1) failing to use reasonable means available to it to attempt to cause replacement of the 102 system by the 117 system on the helicopter in question prior to July 20, 1975; 2) failing to give Smith and Ingle adequate and proper warnings or instructions regarding continued use of the 102 system; and 3) publishing a statement in a flight manual which falsely implied to Smith and Ingle that the helicopter was capable of making an autorotative descent and landing following tail rotor failure.

Bell attacks these findings on the grounds: 1) as a matter of law, Bell had no duty to attempt to cause replacement of the 102 system; 2) there is "no evidence" to support the jury's findings; and 3) the evidence is "factually insufficient" to support the findings.

■ The essential elements of actionable negligence are the existence of a duty on the part of one person to another; the breach of that legal duty; and injury to the person to whom the duty is owed as a proximate result of the breach. *Rosas v. Buddies Food Store*, 518 S.W.2d 534 (Tex. Sup.1975) and cases cited therein; *Cody v. Mahone*, 497 S.W.2d 382, 385 (Tex.Civ.App. —San Antonio 1973, writ ref'd n. r. e.). See also *Mahavier v. Beverly Enterprises, Inc.*, 540 S.W.2d 813 (Tex.Civ.App.—Corpus Christi 1976, no writ). It is undisputed there was injury in the case. Whether such injury proximately resulted from any act or omission of Bell is discussed in a later section of this opinion. Hence, we now address the issue of duty and breach of duty.

■ We first consider Bell's contention that it had no duty to attempt to cause replacement of the 102 system with the 117 system. This Court does not adopt the rule enunciated in *Noel v. United Aircraft Corp.*, 342 F.2d 232, 236 (3rd Cir. 1956) that a manufacturer is under a continuing duty to improve his product, nor is it necessary for us to hold in this case that a manufacturer

has a duty to remedy dangerous defects in a product which are not discovered until after manufacture and sale. See *Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 411 F.2d 451, 453 (2d Cir. 1969). However, where the record reflects, as in this case, an apparent assumption of such a duty by a manufacturer, it is not wholly improper for us to measure its conduct against such duty with respect to plaintiffs' allegations of post-manufacture negligence. *O'Keefe v. Boeing Co.*, 335 F.Supp. 1104, 1130 (S.D.N.Y.1971). Here, Bell assumed the duty to improve upon the safety of its helicopter by replacing the 102 system with the 117 system. Once the duty was assumed, Bell had an obligation to complete the remedy by using reasonable means available to it to cause replacement of 102 systems with 117 systems.

Such a duty in the case at bar would have been satisfied by either mandating replacement through authorized service stations or recommending, in language reasonably calculated to impress upon users the gravity of the risk, that such replacement be made. The jury could reasonably have found from the evidence that there was no affirmative or decisive move by Bell to mandate replacement until after the subject accident. Further, the information received by Ingle regarding the 117 system was not, as a matter of fact, calculated to impress upon him the gravity of the reasons for switching to the 117 system. The service bulletin issued in 1970 merely described the 117 system as being more damage tolerant and longer-lived. It was not until after the accident that Bell issued bulletins which adequately warned users that the 102 system was unreasonably dangerous.

Whether breach of a duty is negligence rests largely upon the circumstances of each case. *Olivarez v. Broadway Hardware, Inc.*, 564 S.W.2d 195 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n. r. e.). Ordinarily, proof of post-accident efforts by a defendant to remedy or improve the situation which contributed to the accident is not admissible or relevant to the issue of negligence. *Roosth & Genecov*

*Production Co. v. White*, 152 Tex. 619, 262 S.W.2d 99 (1953); *Bristol-Myers Co. v. Gonzales*, 548 S.W.2d 416 (Tex.Civ.App.—Corpus Christi 1977), rev'd on other grounds, 561 S.W.2d 801 (Tex.Sup.1978). In this case, however, there was no objection by Bell to the admission of the post-accident procedures taken by it to assure replacement of 102 systems in the field. Hence, the jury could properly consider such evidence in determining Bell's negligence. Moreover, the cumulative effect of all the evidence in the case could have led the jury to believe that Bell failed to do as much as it reasonably could have done to assure that 102 systems be replaced by 117 systems. There is ample evidence to support the jury's findings of negligence on the part of Bell. Furthermore, there is no point on appeal regarding the admissibility or relevance of such evidence.

## V CAUSATION

The jury found that the unreasonably dangerous condition created by the mere presence of the 102 system on the helicopter in question was a producing cause of the accident. Bell attacks the finding of causation by several points of error. In point 3, Bell contends that, as a matter of law, the negligence of Smith and Ingle was the sole cause of the accident. In point 43, Bell asserts there is no evidence of any producing cause. In points 44 and 45, Bell claims the evidence of cause-in-fact between the mere presence of the 102 system and the accident is legally and factually insufficient to support the judgment.

Proof of causation is a necessary element of a strict liability case. *Technical Chemical Co. v. Jacobs,* supra. Specifically, the unreasonably dangerous condition of the product must have been a producing cause of the harm for the supplier to be held liable. *General Motors Corp. v. Hopkins*, supra; *C. A. Hoover & Son v. O. M. Franklin Serum Co.*, 444 S.W.2d 596 (Tex. Sup.1969). There may be more than one producing cause. *General Motors Corp. v. Hopkins,* supra.

In the case at bar, Bell's basic contention is that the negligence of Smith and Ingle was the sole producing cause of the accident or, in the alternative, that this negligence was a new and independent cause of the accident. We disagree. In the present case the trial court defined producing cause as follows:

" 'Producing cause' means an efficient, exciting, or contributing cause, which, in a natural and continuous sequence, either alone or in connection with any other cause or causes, produced a particular result. There may be more than one producing cause of such result."

Plaintiffs' case for cause-in-fact insofar as the 102 system is concerned depended upon evidence that, if Bell had fulfilled the duty breached, the helicopter would have been fitted with a 117 system prior to the accident, and that such blade probably would not have sustained a fatigue fracture, or that if it did, such fracture would have been detected by Smith or Ingle before the ill-fated flight. The evidence was conclusive that the 117 system was more durable than the 102 system. Furthermore, there was evidence that, up to and including the time of trial, there were no reported in-flight fatigue fracture failures involving a 117 system. Moreover, the jury could have found from the undisputed evidence that the 117 system was designed to cure the very problem regarding the 102 system which was the efficient cause of the accident.

Bell's arguments regarding sole cause and new independent cause generally involve the question of foreseeability. This argument has no merit. As stated by the Supreme Court in *Hopkins,* the manufacturer's

". . . liability is not rested upon what he knew or should have known when he manufactured or sold the product, *it rests on his placing into the stream of commerce a product which is demonstrated at trial to have been dangerous.* The damaging event may not have been reasonably foreseeable at the time of manufacture or sale because the danger-ous factor of the product might not then have been even reasonably knowable . . ." (548 S.W.2d at 351). (emphasis supplied).

Even if foreseeability were a necessary element of producing cause (which the cases hold that it is not), there was requisite anticipation in the case at bar. Furthermore, such anticipation tends to negate the existence of sole or new and independent cause on the part of Smith and Ingle. We believe that the foreseeability to Bell of Smith and Ingle's negligent and illegal acts (contrary to FAA mandated inspections) was established by evidence that Bell was aware of the fact that the 102 system on Bell's helicopters were generally receiving inadequate inspection and maintenance. Compare: *Gronlie v. Positive Safety Manufacturing Company,* 50 Mich.App. 109, 212 N.W.2d 756, 759 (1973). Where an intervening act is of such a nature that it might have been anticipated, and is such that the defendant should have provided protection against it, he will be liable regardless of the fact that an illegal act was the immediate cause of the injury. *City of Austin v. Schmedes,* 154 Tex. 416, 279 S.W.2d 326 (1955). Again, in the words of Justice Reavely, writing in *Hopkins,*

"The supplier [might] be free of culpability, but a price of his doing business is to protect people from danger from his products—or to pay. That is a heavy burden on the supplier, but the exposure is not infinite." (548 S.W.2d at 351).

The jury further found that Bell's failure to attempt to cause replacement and failure to warn were proximate causes of the accident in question. Bell also attacks these findings in several points of error. Aside from points 3 and 42, which raise contentions of sole cause, new and independent cause and remote cause, Bell attacks the legal and factual sufficiency of the evidence to support cause-in-fact emanating from Bell's failure to cause replacement and failure to warn. As noted in our discussion of producing cause under strict liability, Bell's contentions regarding sole, new and independent, and remote cause are laid

to rest chiefly because the evidence conclusively showed that Bell had actual knowledge of owner and operator negligence involved in the inspecting, maintaining and handling of the 102 system. We, therefore, turn to Bell's arguments concerning cause-in-fact. Since our discussion of producing cause under strict liability also disposes of cause-in-fact emanating from Bell's failure to attempt to cause replacement, we will limit our present discussion to cause-in-fact relevant to failure to warn although the evidence overlaps.

In the context of failure to warn, any analysis of cause-in-fact must begin with *Technical Chemical Company v. Jacobs,* supra. In *Technical Chemical,* the Supreme Court held that where a consumer, whose injury the manufacturer should have foreseen, is injured by a product sold without a warning, a rebuttable presumption will arise that the consumer would have read the warning and acted to minimize the risks. See *Reyes v. Wyeth Laboratories,* supra. Armed with this presumption, the plaintiff will not, in most cases, be denied recovery as a matter of law. Keeton, Survey of Texas Law, 27 S.W.L.J. 1, 2 (1973).

The record indicates that Ingle's decision not to replace the 102 system on his helicopter appears to be based on economics alone. (The cost was about $2,700.00). Without the relevant safety information, his decision could not have been an educated decision. Moreover, we note that the evidence of Ingle's and Smith's negligence only involved a refusal to heed specific warnings and instructions pertaining to the 102 blade. In truth, the evidence with respect to whether Ingle and Smith would have heeded an instruction letter from Bell was conflicting. However, the jury reasonably could have found from the evidence that such a letter would have been heeded. We overrule points 3 and 42 through 57.

### VI MISUSE

■ The jury further found that Smith and Ingle misused the 102 tail rotor blade by operating it when the blade had in excess of 600 hours on it, but that such misuse was reasonably foreseeable to Bell. In point 54, Bell contends that the record shows conclusively that such misuse created the dangerous condition in the tail rotor blade which caused it to fail. Points 55 and 56 complain of the legal and factual sufficiency of the evidence to support the jury's finding of reasonable foreseeability.

The defense of misuse consists of two primary elements: 1) an unforeseeable misuse, which 2) was a proximate cause of the plaintiff's accident. *General Motors Corporation v. Hopkins,* supra; *Southwestern Bell Telephone Company v. Griffith,* 575 S.W.2d 92, 104 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n. r. e.). The jury's findings in the case at bar, that operating the tail rotor blade in excess of 600 hours was reasonably foreseeable to Bell, precluded the jury from ever reaching the issue of whether such operation was a proximate cause of the accident. Hence, if the evidence was sufficient to support the jury findings of reasonable foreseeability, the defense of misuse clearly was not established. In light of our discussion of Bell's points relating to "CAUSATION" we hold that the evidence was sufficient to establish reasonable foreseeability on the part of Bell that some tail rotor blades would be operated in excess of 600 hours. Points 54, 55 and 56 are overruled.

### VII VOLUNTARY ASSUMPTION OF RISK

■ In point 59, Bell contends that the record demonstrates as a matter of law that Smith and Ingle voluntarily assumed the risk of operating the helicopter with the tail rotor blade in its fatigued condition on the occasion in question. Voluntary assumption of the risk is no longer a defense in the trial of actions based on negligence. *Farley v. M. M. Cattle Co.,* 529 S.W.2d 751 (Tex.Sup. 1975). Hence, our discussion of voluntary assumption of the risk relates only to the claims brought by Smith and Ingle against Bell under strict liability.

■ The issue under voluntary assumption of the risk, as it relates to the facts of this case, is whether, by free and intelligent

choice, Smith and Ingle exposed themselves to a specific danger of injury of which they had actual knowledge and appreciation or of which they could be charged with actual knowledge and appreciation. *Henderson v. Ford Motor Co.,* supra; *Heil Co. v. Grant,* 534 S.W.2d 916 (Tex.Civ.App.—Tyler 1976, writ ref'd n. r. e.). See *Bolin v. Tenneco Oil Co.,* 373 S.W.2d 350 (Tex.Civ.App.—Corpus Christi 1963, writ ref'd n. r. e.). In this regard, Bell points out that both Smith and Ingle were licensed helicopter pilots. Both knew of the purpose of FAA-required and Bell-suggested inspection procedures, yet failed to comply therewith. The jury so found in a number of issues that are not attacked in this appeal. Smith and Ingle understandably point to other evidence in the record. They say that they did not know of the need to replace the 102 system with the 117 system. Smith testified that he would not have flown the helicopter had he known of the dangers of flying with the 102 system. A number of witnesses testified that, in order for owners and operators to make an intelligent choice concerning use of the helicopter with the 102 system instead of the 117 system, they would need the information which was possessed by Bell, but which was not released until after the accident in question.

The question of actual knowledge and appreciation vel non by Smith and Ingle was a fact issue peculiarly within the province of the jury. *Heil Co. v. Grant,* supra. The jury had the prerogative of believing some, all, or none of the evidence introduced by Bell. The evidence was disputed, and the jury chose to believe Smith and Ingle. The defense of voluntary assumption of risk was not established. Point 59 is overruled.

## VIII INDEMNITY

In point 76, Bell contends the trial court erred in awarding Smith and Ingle full indemnity against it for the damages awarded to plaintiffs. We do not agree.

██ A party who is strictly liable to an injured party is required to indemnify a co-tortfeasor only when the co-tortfeasor has been injured due to a breach of a duty owed him by the party strictly liable. *General Motors Corp. v. Simmons,* 558 S.W.2d 855, 859–60 (Tex.Sup.1977); *Champion Mobile Homes v. Rasmussen,* 553 S.W.2d 237, 242–43 (Tex.Civ.App.—Tyler 1977, writ ref'd n. r. e.); *Austin Road Co. v. Evans,* 499 S.W.2d 194, 200 (Tex.Civ.App.—Fort Worth 1973, writ ref'd n. r. e.). Where indemnity is denied, contribution should normally be allowed. See generally, Tex. Rev.Civ.Stat.Ann. art. 2212 (1971); Comment, Comparative Causation, Indemnity and The Allocation of Losses Between Joint Tortfeasors in Products Liability Cases, 10 St. Mary's L.J. 587 (1979); Comment, Indemnity and Contribution Among Joint Tortfeasors, 15 Hou.L.Rev. 1004 (1978).

██ In the case at bar; Smith and Ingle incurred personal injuries and property damage, respectively, as a result of the breach by Bell of a duty it owed Smith, Ingle, Bradshaw and Hunsaker, under strict liability. Smith and Ingle also breached a duty of care they owed to Bradshaw and Hunsaker. They did not breach, however, any duty they might have owed to Bell. See *General Motors Corp. v. Simmons,* supra. We, therefore, affirm the trial court's judgment awarding Smith and Ingle indemnity against Bell. We think that such result may be shocking, particularly in light of the fact that it may be said that Smith and Ingle were far more culpable regarding plaintiffs' injuries than was Bell. The Supreme Court, has, in *General Motors Corporation v. Simmons,* supra, urged the legislature to study the statutes in this area with an eye toward needed remedial legislation. We agree.

Had we arrived at a decision necessitating a ruling on the legal and factual sufficiency of the evidence supporting the jury's apportionment of the negligence to Bell, Ingle and Smith, we would have held that there was sufficient evidence to support the jury's finding that the damages awarded to the plaintiff should be proportioned 44% to Bell, 44% to Ingle and 12% to Smith.

## IX DAMAGES OF BRADSHAW AND HUNSAKER

By its point of error 68, Bell contends that the trial court erred in admitting the opinion testimony of Hunsaker concerning his projected income from his and Bradshaw's business of selling farms and ranches because such business allegedly had not been in existence for a sufficient time to support such an opinion. In support of this point, Bell has cited a number of "lost profit" cases, all of which essentially hold that, in Texas, lost profits of a business may be recovered as damages if the business is shown to be established and profitable at the time of the tort or breach of contract, but lost profits in the future may not be recovered if the business is new and unestablished. The distinction rests on reasoning that preexisting profits, in the total context of circumstances, may supply the requisite legal certainty as to both fact and amount of damages, whereas to award as damages the hoped-for profits of a new and unestablished business is to leave too much to conjecture and speculation. *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938); *Atomic Fuel Extraction Corp. v. Estate of Slick*, 386 S.W.2d 180, 188–89 (Tex.Civ.App.—San Antonio 1965), writ ref'd n. r. e. per curiam, 403 S.W.2d 784 (Tex.Sup.1966); *Norris v. Bovina Feeders, Inc.*, 492 F.2d 502, 506 (5th Cir. 1974).

Hunsaker started his own real estate company in 1965 when he went into partnership with his mother. Initially, the company listed and sold residential real estate through a single office. Through the years other offices for residential sales were opened.

In addition to residential sales, Hunsaker also had been interested in farm and ranch sales since 1972. In 1975, Hunsaker and Bradshaw opened an office solely devoted to farm and ranch sales. His partner in this venture, which was actually separated from the residential sales partnership that Hunsaker had with his mother, was Bradshaw. The latter had been interested in the sales of farms and ranches since about 1972.

At the time of the accident, the farm and ranch venture between Hunsaker and Bradshaw, which was about four months old, involved about six people. According to Hunsaker, the farm and ranch office was "well on the way" and had been doing "better than expected." Several farm and ranch properties had been listed with them for sale. Hunsaker already had made one sale on his own and one sale jointly with Bradshaw.

After the accident, the farm and ranch office was closed. Since the crash, however, Hunsaker had been able to return to the sales of farms and ranches on a limited basis and had found it to be "still very lucrative." Counsel for plaintiffs, over Bell's objection, asked Hunsaker, based on his prior experience, to estimate what he and Bradshaw could reasonably expect to earn in the future. Hunsaker answered:

"A: I was looking at making between a hundred and a hundred and fifty thousand dollars out of the farm and ranch office. Those prices today would be in the neighborhood of two hundred thousand and above.

Q: Do you have an estimate as to what Mr. Bradshaw would have been making?

A: I think he would have made the same."

In the instant case, unlike the "lost profits" cases relied upon by Bell, the evidence shows that Hunsaker had interest in the selling of farms and ranches dating back to 1972, three years before the formal establishment of an office devoted exclusively to the sale of farms and ranches. Thus, the rationale of the "new and unestablished business" cases does not apply. We are of the opinion that Hunsaker's experience was adequate to support his opinion testimony. Moreover, if there was error in the admission of the questioned testimony, such error was harmless, since it is undisputed that both Hunsaker and Bradshaw are able to work only about 50 percent of the time because of their injuries, and each was earning in the vicinity of

$100,000 a year at the time of trial. Such evidence is supportive of the $200,000 annual figure testified to by Hunsaker.

By its points of error 69 and 70, Bell attacks the jury's awards of damages to Hunsaker and Bradshaw, respectively, as being excessive and not supported by sufficient evidence. These awards represented loss of past and future wage earning capacity, loss of past and future physical capacity, and past and future pain, suffering and mental anguish. We said in *Browning v. Paiz*, 586 S.W.2d 670, 675–676 (Tex.Civ.App. —Corpus Christi 1979, writ ref'd n. r. e.):

". . . In disposing of the 'remittitur' points as excessive, we consider only the evidence that is favorable to the award. *Wharf Cat, Inc. v. Cole*, 567 S.W.2d 228 (Tex.Civ.App.—Corpus Christi 1978, n. r. e.); *Sunset Brick & Tile, Inc. v. Miles*, 430 S.W.2d 388 (Tex.Civ.App.—Corpus Christi 1968, n. r. e.). The rule is that on appeal, the findings by the jury will not be disturbed (on the ground of excessiveness) if there is any probative evidence to sustain the award. In the end, the Appellate Court should not substitute its judgment for that of the jury in absence of a rather clear showing of passion, bias or prejudice. After such a review of the evidence, and if the end result is that the award is so excessive that it shocks the conscience of the Appellate Court, remittitur would be proper. *World Oil Co. v. Hicks*, 129 Tex. 297, 103 S.W.2d 962 (Tex. Comm'n.App.—1937, judg't adopted), reaffirmed in *Dallas Railway & Terminal Co. v. Farnsworth*, 148 Tex. 584, 227 S.W.2d 1017 (Tex.Sup.1950). *Sunset Brick & Tile, Inc. v. Miles*, supra."

See also *J. A. Robinson Sons, Inc. v. Ellis*, 412 S.W.2d 728 (Tex.Civ.App.—Amarillo 1967, writ ref'd n. r. e.) and *Main Bank & Trust v. York*, 498 S.W.2d 953 (Tex.Civ.App. —San Antonio 1973, writ ref'd n. r. e.). ▮ Applying the above rules to the particular facts of this case, we are of the opinion that the jury's verdict as to general damages incurred by Hunsaker and Bradshaw was not so excessive as to warrant a reversal. Both men experienced broken backs as a result of the crash, with Hunsaker further experiencing neurological complications. Both men obviously experienced pain. Hunsaker remained in the hospital for about nine weeks and in a body cast for about six months. He developed a phlebitis condition as well, and suffered from bladder and sexual problems the latter of which still caused him trouble at the time of trial. Bradshaw developed acute thrombo-phlebitis and experienced trouble breathing while in the hospital.

At the trial, one doctor testified that Bradshaw had a permanent physical impairment to be as high as 60 percent. Hunsaker had a life expectancy of 35.3 years. Bradshaw had a life expectancy of 26.4 years. There was testimony that a person could actually triple his income in the business of selling farms and ranches by working twice as hard. The plaintiffs' injuries, however, prevented them from being quite so active in their newly-formed business.

These awards were not excessive. The jury could properly take the effects of inflation into account. *Southern Pacific Transportation Co. v. Peralez*, 546 S.W.2d 88 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.). Points 69 and 70 are overruled.

▮ By its point of error 71, Bell attacks the jury's award of $50,000.00 to Bradshaw for his future medical expenses. It contends that Dr. John Pettigrove's testimony regarding Bradshaw's reasonable and necessary costs for future medical care was inadmissible because it was not based on reasonable medical probability. Points of error 72 and 73 attack the legal and factual sufficiency of the evidence to support the jury's award.

Dr. Pettigrove testified:

"As far as I know, he hasn't been seeking any medical treatment in the last two years, except for a support hose and staying off the leg. So, he has not really expended any money right now, and he might not have any problem for several more years. He might not have any more problem except for swelling in his

leg, so it could be zero to sixty-seventy thousand dollars or more."

\* \* \* \* \* \*

"I only see those people when they are ill or when they have a real problem, so I really have no idea how many other people like this are still carrying on with no problems. But, of the patients that I have seen who get into trouble with this kind of problem, from back injury or whatever, to have chronic phlebitis and recurring swelling in their leg, these people commonly develop pulmonary embolism. They have problems with fairly frequent hospitalization; that is to say, on the basis of every two or three years, which is for most people fairly frequent. In today's situation that's extremely expensive. Anybody knows if you stay in the hospital more than two or three days, you are talking about several thousand dollars' expenditure. That's not likely to get less or decrease, regardless of what happens over the next several years.

I would have to estimate from that, each hospitalization would probably be in the range of three to ten thousand dollars. Doctors, hospital bills, x-rays, treatments, drugs, everything, and that if you are talking about that every two to three years you're talking about anywhere from forty to sixty thousand dollars of medical expenses at today's costs."

From the above quoted parts of the record, it appears to us that Dr. Pettigrove based his opinion on medical probability rather than possibility, and on likelihood rather than an extreme situation. Bell's point 71 is overruled.

■■■ Turning to the legal and factual sufficiency points of Bell, we note that an award of future medical expenses is a matter of which no precise evidence is required, it being a matter particularly for the jury and upon which the jury may make its award based on the nature of the injuries, medical care rendered before trial and the condition of the injured party. *Southwestern Bell Telephone Co. v. Thomas*, 535 S.W.2d 686 (Tex.Civ.App.—Corpus Christi 1976) aff'd in part and rev'd in part, on other grounds, 554 S.W.2d 672 (Tex.Sup. 1977); *City of Houston v. Moore*, 389 S.W.2d 545 (Tex.Civ.App.—Houston 1965, writ ref'd n. r. e.).

Applying the above rules to the facts of the case at bar, we are of the opinion that there is sufficient evidence to support the jury's awards. Points 71 through 73 are overruled.

## X INGLE'S DAMAGES

In answer to special issues 100 and 101, the jury found the sum of $38,820.56 to be the reasonable cost of repairing the helicopter and the value of loss of its use. In response to special issue 16, the jury found that Bell's failure to use reasonable means available to it to attempt to cause a replacement of the 102 system with the 117 system was an unconscionable act. The jury, in its answer to special issue 32, found that the statement in the flight manual concerning autorotative landing was a deceptive trade practice.[3] Based on those findings, the sum found to be costs for helicopter repair and loss of use was trebled by the trial court, and judgment was rendered that Ingle recover that trebled sum ($116,461.78) from Bell.

Bell, in its point of error 61, attacks the jury findings on the ground that the only remedy for damages to the product itself and economic loss is breach of warranty under the Texas Business and Commerce Code. Reliance for this proposition is based upon the recent Supreme Court decisions in *Signal Oil & Gas Company v. Universal Oil Products*, 572 S.W.2d 320 (Tex.Sup.1978); *Mid-Continent Aircraft Corporation v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex.Sup.1978) and *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d

---

**3.** The Flight Manual Statement read:

"Tail Rotor Failure

1. Execute a normal autorotative descent and maintain an airspeed of at least 40 m. p. h.

2. Execute a normal autorotative landing."

77 (Tex.Sup.1977). Ingle did not plead for a recovery on the theory of breach of warranty.

■ The jury found that Bell was negligent in failing to warn Ingle of the probable effect of continued use of the 102 system, and was negligent in failing to attempt to cause replacement of the 102 system. The jury further found that such negligence of Bell proximately caused the helicopter to crash. The result of this negligence was the damage to the helicopter and the loss of its use. Hence, such actual damages were recoverable by Ingle under negligence, even though Ingle did not plead for a recovery for an alleged breach of warranty.

■ Bell further complains of the trial court's actions in trebling the sum found by the jury in response to issues 100 and 101. The trial court's action in trebling the damages to Ingle was based upon the jury findings that Bell had committed an unconscionable act towards Ingle and had engaged in a deceptive trade practice. Bell contends that the trial court erred in trebling his damages since there was no evidence to support the jury findings of unconscionability and deceptive trade practice. We agree.

Unconscionability is defined by the Deceptive Trade Practices Act as "an act or practice which, to a person's detriment . . takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree . . ." Tex. Bus. & Comm. Code Ann. § 17.45(5)(A) (Supp.1979). The act or practice which allegedly constituted an unconscionable act in this case was the failure by Bell to use reasonable means available to it to attempt to cause Ingle to replace the 102 system with the 117 system. While it is certainly true that there is evidence of Bell's failure in this regard, we can find no evidence that such failure took advantage of Ingle's "lack of knowledge, ability, experience, or capacity" to any grossly unfair degree. Although the omission by Bell might have been unfair, it was certainly not *grossly* unfair. There was no evidence that Bell's failure to

attempt to cause replacement involved any wrongful intent to take advantage of Ingle.

Likewise, we can find no evidence of any deceptive trade practice in this case. The concept of deceptive trade practice is defined in the Act as including, but not limited to, twenty-one separate enumerated practices, none of which apply to the case at bar. The jury found Bell guilty of committing an *unspecified* deceptive trade practice. Regarding its finding, the jury was instructed that an act is deceptive if "when performed in trade or commerce, it has the tendency and capacity to mislead that portion of the general public to whom such conduct is directed." The jury was further instructed to look to the "overall impression that such conduct would have on the general public, including the ignorant, the nonthinking and the unsophisticated." This definition was essentially that approved by the Supreme Court in *Spradling v. Williams*, 566 S.W.2d 561 (Tex.Sup.1978). The act complained of in the instant case involved the publication of an instruction in the flight manual of the helicopter regarding autorotation following tail rotor failure. We hold that there is no indication from the record that such flight manual instruction was intended to deceive persons like Ingle. *Barnhouse Motors, Inc. v. Godfrey*, 577 S.W.2d 378, 381 (Tex.Civ.App.—El Paso 1979, no writ). There is no evidence of a violation of Section 17.46(a) of the Act.

## XI THE JUDGMENT

Turning back to the trial court's judgment awarding damages to the plaintiffs, we hold that the jury's answers to the "mere presence" issues support the recovery by the plaintiffs against Bell under strict liability. As has been stated, the jury found that the amount of damages and the cost of repairs to the helicopter totalled the sum of $38,820.56. The trial judge trebled such damages and rendered judgment for Ingle in the sum of $116,461.68. Since we have held that this was error because Bell did not violate the Deceptive Trade Practices Act, the judgment in Ingle's favor must be modified by reducing the amount

of Ingle's recovery from $116,461.68 to $38,-820.56. Accordingly, the judgment of the trial court is hereby modified, and judgment is here rendered that Ingle have and recover judgment against Bell in the amount of $38,820.56 as damages, together with interest thereon from May 15, 1978, when the trial court's judgment was rendered, at the rate of 9% per annum, until paid. The judgment in all other respects is affirmed.

All costs of this appeal are taxed 5% to Ingle and 95% to Bell.

The judgment is MODIFIED, AND AS MODIFIED, IS AFFIRMED.