Dorothy JACKSON, Individually and as Representative of the Estate of Oscar Jackson, Jr., Deceased, Plaintiff-Appellant,

v.

FIRESTONE TIRE & RUBBER COMPANY and Goodyear Tire & Rubber Company, et al., Defendants-Appellees.

No. 84–1460.

United States Court of Appeals, Fifth Circuit.

April 30, 1986.

Tom Needham, Ford, Needham & Johnson, Dallas, Tex., for plaintiff-appellant.

Eugene W. Brees, II, David S. Kidder, Dallas, Tex., for Goodyear Tire & Rubber Co.

John L. Lancaster, III, Dallas, Tex., for Fruehauf Corp., et al.

J. Carlisle DeHay, Jr., Kevin J. Cook, Dallas, Tex., for General Tire & Rubber Co.

Patrick Zummo, James Edward Maloney, Baker & Botts, Houston, Tex., for Firestone Tire & Rubber Co.

John E. Agnew, Dallas, Tex., for interested party, Illinois Employers Mut. of Wausau.

Before GOLDBERG, REAVLEY, and GARWOOD, Circuit Judges.

### ON PETITIONS FOR REHEARING AND SUGGESTIONS FOR REHEARING EN BANC

(Opinion January 2, 1986, 5th Cir.1986, 779 F.2d 1047)

GOLDBERG, Circuit Judge:

Upon consideration of appellees' petitions for rehearing we withdraw the original text of this opinion and substitute the following:

This is an appeal in a Texas diversity case take-nothing judgment in a survivorship and wrongful death action, predicated

on claims of negligence and strict liability. A jury found, by special verdicts, that the multi-piece truck wheel components in question were not defectively designed, and that no duty to warn had been breached by the manufacturers; the jury also determined the decedent to have been 100% contributorily negligent. Appellant, decedent's surviving common-law wife, challenges the judgment on grounds that certain proffered evidence was improperly excluded and that the court's charge to the jury was improper and incomplete. We reverse in part and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 14, 1979, Oscar Jackson, Jr., the original plaintiff below, was employed by Dal-Har Distributing Company of Dallas, Texas, a small, intrastate trucking company. On the day in question, one of Dal-Har's trucks had a flat that required changing. The usual "tireman" was absent, so Jackson filled in, as he often did. The usual procedure at Dal-Har was to remove the wheel and tire assembly from the truck, take a substitute wheel—ordinarily already assembled[1]—or the wheel from the truck, mount a new tube and a tire on the wheel, inflate the tire, and balance the assembly. On the day in question, however, no substitute wheels were already assembled. Consequently, Jackson assembled his own wheel from a Firestone 5° rim base and a Goodyear LW side ring.[2] As is customary for truck tires, whether they be mounted on multi-piece or on single piece wheels, the tire was inflated inside a

containing device known as a "tire cage," the purpose of which is to prevent injury in the event the wheel or the tire explodes when inflated to the high pressures customary for truck tires, typically up to 100 pounds per square inch. Jackson inflated the $10.00 \times 20$ tube-type tire he had mounted on the mismatched wheel assembly inside a tire cage. He then proceeded to take it to an adjacent area of the shop where the tire "bubble-balancing" machine was located.

Jackson requested assistance from his immediate supervisor, Clyde Phillips, in balancing the tire. Phillips was semi-retired, but had been an owner and founder of Dal-Har. At the time of the accident, Phillips, not Jackson, was tapping balancing weights onto the wheel rim; the wheel and tire were mounted horizontally on the balancing machine. Because balancing is a hands-on exercise, use of a tire cage would be ineffective or impractical, and there was none.

Jackson was standing three to five feet away from the tire assembly, watching Phillips. After having placed one weight successfully on the rim, Phillips was hammering a second weight on the opposite side of the rim when the wheel, without warning, exploded. The force of the explosion knocked Phillips' left hand (the hammer was in his right hand) into his head and knocked him to the floor some eight to ten feet distant. The side ring flew sideways, apparently hitting Jackson in the forehead and knocking him down some feet away. Phillips testified that the side ring,

---

1. Truck wheels that are meant for use with tube-type tires are ordinarily composed of two or three main pieces. The sidewall of a tube-type tire is so stiff and rigid that it may not easily be mounted on a single piece wheel, such as is customary for automobiles. Consequently, truck wheels for tube-type tires have a rim base with a retaining flange at the bottom side; a second, flange-like component must be fixed to the open side in order to retain the tire. This is effected by using either a one piece split side ring (a sort of retaining clip *cum* flange) or a two piece system, consisting of a solid side ring (the flange) and a retaining lock ring. The Firestone 5° rim base in question here was one component of a three piece Firestone truck

wheel; the Goodyear LW side ring was intended to be part of a two piece Goodyear wheel. The parties have stipulated that neither Goodyear nor Firestone intended that its respective part be used or matched with the other component in this case.

2. He did not "break down" the wheel assembly from the truck that held the flat tire; evidence indicated that at the time of the accident the flat tire remained mounted on the truck. The appellant concedes that Jackson mismatched the Firestone 5° rim base with the Goodyear LW side ring.

presumably after hitting Jackson, went *through* the corrugated tin roof on the shop, some twelve to fourteen feet above the floor.

Oscar Jackson suffered massive head injuries from the accident. He underwent several surgeries, including an implantation of a metal plate in his forehead to replace the cranial bone tissue that had been shattered by the accident. Jackson survived, but suffered a severe loss of frontal lobe functions, resulting in his total incapacity to return to work, loss or impairment of intellectual mental functions, and considerable pain. He remained in the hospital for fourteen days, seven spent in intensive care. Some six months or so later, he began to suffer bouts of nausea and severe headache pain, which later were recognized to be and were treated as seizures. Jackson regained some mobility and could tend to his basic needs, talk, and walk, but he was not the same man. His attention span and behavior were childlike and he required almost constant supervision by his wife, Dorothy, the appellant here.[3]

On June 26, 1980, Jackson filed a complaint against Firestone Tire & Rubber Company, the Goodyear Tire & Rubber Company, Fruehauf Corporation, and the General Tire & Rubber Company, alleging negligence and strict liability.[4] He sought $4 million in actual and compensatory damages, and $12 million in punitive damages.[5] On August 11, 1980, the Illinois Employers

Insurance of Wausau intervened, seeking to assert its subrogation rights as workmen's compensation carrier for Dal-Har. *See* Tex.Rev.Civ.Stat.Ann. art. 8307, § 6a.

Plaintiff's theory of liability was that Firestone and Goodyear, as manufacturers of the component wheel parts involved in the accident, were strictly liable for their allegedly defective design, manufacture, and marketing of multi-piece components generally; plaintiff argued that multi-piece wheels in general, and the component parts involved in this accident in particular, were unreasonably dangerous devices because of an alleged propensity to explode under foreseeable use, and because of a propensity for component parts to be mismatched with the same result. Jackson also alleged strict liability and negligence for an alleged failure by the manufacturers to instruct as to proper, safe use and for failure to warn of the hazards associated with multi-piece wheel assemblies.

Appellees (Goodyear, Firestone, Fruehauf, and General) denied these allegations and asserted the affirmative defenses of misuse, material alteration (by virtue of the mismatch), intervening cause, contributory negligence, assumption of risk, and unavoidable accident. In addition to the component mismatch, defendants alleged that Jackson had used a damaged and distorted side ring. In response to the strict liability claims, appellees asserted that Jackson, both as a "professional" and as an experi-

---

**3.** The terms "appellant" and "plaintiff" are used interchangeably hereafter, as are the terms "appellees" and "defendants."

Dorothy and Oscar were never ceremonially married; the defendants contested the assertion of a common-law marriage, but the jury determined that Dorothy and Oscar were indeed common-law spouses.

**4.** Monarch Manufacturing Company, Inc. was an original defendant but was dismissed from the suit for lack of service. *See* minute entry, July 9, 1980.

The tire in question carried a Fruehauf label but had been manufactured by the General Tire Company and labeled with Fruehauf's name at its request, apparently a relatively common practice in the tire industry. Fruehauf and General cross-claimed and counter-claimed but, prior to submission of the issues to the jury, ob-

tained a directed verdict, which appellant does not here challenge.

We AFFIRM the district court's dismissal of the case as to defendants Fruehauf and General Tire.

**5.** Jackson sought an additional $20 million in punitive damages, alleging that the defendants had engaged in a conspiracy to suppress the distribution and use of tubeless tires and single piece wheels; that they had participated in the creation of a political slush fund for the Committee to Re-Elect the President in 1972 in return for political favors, including the termination of federal and state investigations of the multi-piece wheel; and that they had conspired to prevent suitable warnings about the dangers of multi-piece wheels from being placed on their products. These issues were excluded by pretrial order of a multidistrict litigation panel.

enced former truck driver and tireman, was subjectively aware of the dangers involved in using multi-piece wheels, specifically respecting mismatches or use of worn out or otherwise unserviceable parts; they asserted that, under Texas strict liability law, there is no duty to warn a user with such actual knowledge. There was also a suggestion that Jackson might have been drinking on the job.[6]

On October 14, 1980, this case joined some thirteen other cases as a "tag along" transfer to multidistrict litigation, styled *In re Multi-piece Rims Products Liability Litigation*, MDL No. 362 in the Western District of Missouri. *See* 28 U.S.C. § 1407 and Rule 9 of the *Rules of Proceeding of the Judicial Panel on Multidistrict Litigation*, 78 F.R.D. 561, 567–68 (1978). On October 8, 1982, following national pretrial discovery, the MDL Panel issued some preliminary rulings that, *inter alia*, struck three of the common claims in that MDL proceeding from the individual actions, including accusations that the defendants engaged in a willful conspiracy to prevent warning labels or other warning markings from being distributed with or being placed upon multi-piece wheels; that they intentionally withheld material information from a National Highway Traffic Safety Administration (NHTSA) investigation and made material misrepresentations to NHTSA; and that they created illegal political "slush funds" in return for executive influence of investigations into the multi-piece wheel.

On December 8, 1982, the case was remanded from MDL 362 and began its own pretrial discovery phase. The district court, Fish, J., treated the MDL exclusion of issues determination as the law of the case. On February 11, 1984, shortly before trial, Oscar Jackson died. Dorothy Jackson was substituted as plaintiff on March 21, and amended pleadings were filed. On March 23, the court issued its final schedul-

ing order, specifically requiring the filing of all the parties' exhibit lists, proposed witness lists, and final designations for MDL documents; the court indicated that these lists would control the case, absent amendment by leave, to prevent injustice. On March 28, the court issued an order *in limine*, discussed in detail *infra*.

On April 2, 1984, this case went to trial. On April 9, following the conclusion of appellant's evidence, Fruehauf and General Tire moved for a directed verdict, which the court granted. It dismissed Jackson's action regarding these defendants with prejudice. *See* note 4 *supra*.

After the presentation of all evidence, the court submitted the case respecting Goodyear and Firestone to the jury by special submissions that presented, *inter alia*, the following issues: (1) (strict) products liability, including (a) defective design by the defendants and (b) defendants' alleged failure to warn adequately; (2) defendants' negligence in design and failure to warn adequately; (3) defendants' gross negligence and the possibility of punitive damages; (4) contributory negligence; and (5) apportionment of comparative causation as between Oscar Jackson, Firestone, and Goodyear.[7] The jury answered the interrogatories consistently in favor of defendants, and found 100 per cent contributory negligence by Jackson. On April 24, the court entered judgment on the jury's take-nothing verdict. On May 4, appellant moved for a new trial, which was denied on May 8. On May 23, appellant timely filed her notice of appeal.

## II. STANDARD OF REVIEW

Appellant does *not* challenge the sufficiency of evidence to support any of the jury's findings. Indeed, at oral argument, counsel for appellant essentially conceded the propriety of the jury's verdict, given

---

6. Upon Jackson's admission to the emergency room at Parkland General Hospital in Dallas, the receiving physician noted in his report that he smelled ethanol on Jackson's breath. A subsequently attending neurosurgeon did not notice any alcohol during his contact with Jackson.

Clyde Phillips had not seen Jackson drinking on the job on the day in question or any other time.

7. Other issues not implicated in this appeal or unnecessary to our decision are not discussed.

the evidence that was before them. Appellant's attack on the judgment is predicated upon her assertion that the district court improperly restricted the scope of the evidence. Accordingly, we must determine only whether the district court abused its discretion in handling the evidentiary matters before it, not whether the record supports the verdict.

Because the appellant does not here challenge the sufficiency of the evidence or the findings of the jury, we consider those findings to be binding upon our analysis except insofar as they themselves may be predicated upon an error of law, such as a faulty submission or instruction by the court.

■ A trial court is ordinarily accorded wide latitude and discretion in making evidentiary rulings. We overturn its determinations only where the court has abused its discretion, or where plain error has occurred. Fed.R.Evid. 103(a), (d); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 271 (5th Cir.1980). Determinations of whether to exclude even relevant evidence because of its potential for prejudicial or inflammatory effects upon the jury are made by balancing inflammatory potential against the likely probative value of the evidence. *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1319 (5th Cir.) (en banc), *question cert.*, 757 F.2d 614, *cert. denied*, 469 So.2d 99 (Miss.1985); *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1153 (5th Cir.1981); 10 J. Moore, *Federal Practice* § 403.02[4] at IV–74 (1982); *see also Tugwell v. A.F. Klaveness & Co.*, 320 F.2d 866, 868 (5th Cir.1963), *cert. denied*, 376 U.S. 951, 84 S.Ct. 967, 11 L.Ed.2d 970 (1964); *cf.* Fed.R. Civ.P. 61 (substantial justice standard).

■ All material issues raised by the pleadings and supported by evidence adduced at trial are to be submitted to the jury for consideration. *Harville v. Anchor-Wate Co.*, 663 F.2d 598 (5th Cir.1981);

*Duke v. Sun Oil Co.*, 320 F.2d 853, 865 (5th Cir.1963).

■ We review the court's charge to the jury subject only to the standard that, read as a whole, the charge should be a fair presentation of the contested issues, with unambiguous submission of any ultimate questions of fact. *Bryan v. Cargill, Inc.*, 723 F.2d 1202, 1204 (5th Cir.1984); *Dreiling v. General Electric Co.*, 511 F.2d 768, 774 (5th Cir.1975). It is not incumbent upon a trial court to adopt verbatim any of the parties' suggested wordings of specific instructions, issues, or definitions. Fed.R. Civ.P. 49(a); *Bryan v. Cargill, Inc.*, 723 F.2d at 1204; *Dreiling*, 511 F.2d at 774. A court need not submit every issue singly; it may choose more general submissions. *Bryan v. Cargill, Inc.*, 723 F.2d at 1204; *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 334 (5th Cir.1981); *Dreiling*, 511 F.2d at 774.

Finally, we note that, because this is a diversity case, Texas law governs all questions of substantive law. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### III. APPELLANT'S THEORY OF LIABILITY

Appellant's main contention is that multi-piece rims are unreasonably dangerous because in use the risk is too great that they will not fit together with the exactness required to prevent explosive disassembly. That danger, appellant asserts, is enhanced by, but not limited to, the similarity and appearance of all multi-piece rim components. The contention is that the misfit of the components, whether designed to match or not, is not likely to be detected by users, and that therefore these products of appellees' should not be put into commerce. Appellant further contended that, if the multi-piece design was produced, a more thorough warning should have been given to the users.[8]

---

**8.** *See* Appellant's Brief at 2–3 (summary of the argument):

In the court below, Plaintiff sought to prove that the multi-piece wheel components were de-

fectively designed, thereby giving them the proclivity for explosive disassembly. Plaintiff sought to prove that the Firestone 5° truck rim and the Goodyear LW ring were each defective-

It is important, but difficult, to determine at the outset the appropriate level of generality at which to assess appellant's claims. As the court noted in *Bell Helicopter Co. v. Bradshaw,* 594 S.W.2d 519 (Tex. Civ.App.1979), a case involving a helicopter crash, "The threshold question ... is the identity of the product being litigated." *Id.* at 529. The court rejected as "artificial and of little analytical value" defendants' suggested characterization of the product at issue as the actual helicopter blade that broke. On the other hand, the court also rejected plaintiffs' suggestion that the product being litigated was the whole helicopter and all relevant product information accompanying its sale. Instead, the court navigated a course between these two definitions of the product—one too narrow and specific, the other too broad and general— in arriving at the "102 series tail rotor system" as the defective product: "That system failed to perform on the day in question." *Id.*

This case presents similar problems of characterization. Viewed from the narrowest perspective, the "product" at issue here is the particular truck wheel that exploded. In order to make out a case of products liability, or negligence, appellant must connect up something appellees did (or failed to do) with what happened to Oscar Jackson. Needless to say, Goodyear and Firestone do not plan, design, manufacture, or market wheel components on an individual basis. Appellees did not do anything relevantly "different" to the particular wheel components that failed here that was not done to millions of other such components of the same size, shape, and model. Furthermore, there is nothing in the record to suggest that the Firestone 5° rim base or the Goodyear LW side ring are unique models of multi-piece wheel components that presented special problems of design,

manufacture, or marketing. Indeed, it is not even clear that appellees ever focused their corporate attention upon these particular models *as such.* Thus, appellees' efforts to design, manufacture, and market wheel components of the same general type as the particular parts that failed here are relevant to appellant's strict liability and negligence theories.

As part of her theory of liability outlined above, appellant raises a number of issues regarding the exclusion of evidence. Specifically, appellant argues that the following sorts of evidence are relevant and important to her case: (1) evidence of the availability of an alternative, safer product; (2) evidence of the similar appearance of other similarly designed products; (3) evidence of similar accidents involving similarly designed products.

Evidence of the availability of a safer alternative product would, if believed by the jury, tend to show that the product in question was unreasonably dangerous if (a) the product is dangerous, and (b) the safer alternative was not technologically unfeasible or prohibitively costly.

Evidence of the similar appearance of other similarly designed products would be necessary to establish that the Firestone 5° rim base and the Goodyear LW side ring have a propensity to be mismatched, not merely with each other, but with other such components that are similar in appearance. If the jury has no reason to believe that other multi-piece wheel components are similar in design and appearance, then the "mismatch" argument cannot really be made—appellant is reduced to arguing only that the Goodyear LW side ring could be confused with a Firestone side ring and that the Firestone 5° rim base could be confused with a Goodyear rim base.

---

ly designed and subject to explosive disassembly even if matched with an intended component part. Plaintiff further sought to prove that all multi-piece rim components look basically the same and are indistinguishable from one another, thereby resulting in multi-piece wheel components being mis-matched and greatly enhancing the danger of explosive disassembly. Plain-

tiff further sought to prove that the Defendants Goodyear and Firestone were fully aware of the defective design and of the consuming public's unawareness of the problem, but that the Defendants nevertheless failed to warn the consuming public of the defect or to instruct them as to the safe use of the product, if any.

Evidence of similar accidents involving similarly designed products goes to the reasonableness of putting such a product on the market. Appellant should be allowed to show, if she can, that products similar in all relevant respects to appellees' have a long history of unacceptable accident rates, and that appellees were well aware of this situation at the time they made the particular products at issue here. Such evidence, if believed by the jury, would, in conjunction with evidence of safer alternatives, tend to show the unreasonableness of putting appellees' products on the market.[9]

Much of this evidence was excluded by the district court below. On March 28, 1984, the court entered a severe order *in limine*, which reads in part as follows:

Plaintiff, Plaintiff's counsel, and any witnesses called or examined by Plaintiff are ordered to refrain from mentioning any of the following matters and from directing questions reasonably calculated to elicit answers referring to any of the following matters, except after approaching the Court out of the hearing of the Jury and obtaining a ruling that such matters are admissible before the Jury:

. . . .

(3) Any reference to or mention whatsoever of a proposal before the legislature of the Commonwealth of Massachusetts to ban *all* multi-piece wheels.

. . . .

(7) Any reference to or mention of any multi-piece wheels other than the LW and the 5° in issue in this litigation.

(8) Any statement during open argument including references to any "misrepresentations" or "dishonesty" of the defendants or the use of terms such as the "widow maker", the "suicide wheel" or the "killer wheel" or the use of other such inflammatory language.

(9) Any reference to or mention whatsoever of a segment of a television program entitled "60 Minutes" devoted to multi-piece wheels.

. . . .

(13) Any reference to or mention whatsoever of any documents generated by non-parties to this litigation.

. . . .

(15) Any reference to or mention of any other litigation involving multi-piece wheels, including the use of documents or exhibits bearing other cause numbers or names.

(16) Any reference to or mention of any "confidential" documents (all documents in M.D.L. 362 were designated confidential and subject to a protective order) or to "You are the first jury to see these documents" or "Test this design" or similar statements which are calculated to inflame the jury and to suggest that the Defendants have in some manner hidden the facts or evidence in this matter.

. . . .

(18) Any reference to or mention of the Goodyear Rim Exchange Program begun in 1977.

. . . .

(22) Any evidence or argument relating to the consolidation of lawsuits involving multi-piece rims, and any discovery conducted therein, styled *In Re: Multi-Piece Rim Products Liability Litigation*, MDL 362.

4 Record on Appeal ("Rec.") at 761–66. These limited excerpts from the order *in limine* serve to suggest its rather draconian sweep. In theoretical terms, the order might be defended on grounds that it does no more than ensure that questionable matters will not be presented to the jury before

---

**9.** *See, e.g., Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d at 529:

Admittedly, most of the documented failures, between 1968 and 1976, including the accident in question, were largely the result of operator abuse or misuse. Such abuse was common. It was fully known to Bell.... The existence and availability of this superior alternative rotor 117 system, together with Bell's knowledge that mishandling of the 102 type blade was occurring with alarming frequency in the field and was causing catastrophic accidents, was sufficient evidence for the jury to have found that, after 1970, the presence of 102 systems rendered helicopters like Ingle's unreasonably dangerous.

their admissibility has been ruled on. In practical terms, however, the order amounts to a presumption against admissibility of the items enumerated, some of which constitute essential elements of appellant's theories of recovery, as outlined above. For example, the presumption against admissibility of "reference to or mention of any multi-piece wheels other than the LW and the 5°'" strikes at the heart of appellant's "mismatch" theory. As noted previously, and as will be developed more fully below, the relevant comparison base for a mismatch argument is the whole range of indistinguishable multi-piece wheel components, not merely the matching parts to the components at issue here.

Of course, even if the order *in limine* were facially unobjectionable, inquiry would still necessarily focus on the way it was applied. The record reflects that in most instances it was strictly applied, and that the "presumption" against admissibility hardened into an actual ruling against admissibility.[10] The following sections analyze some of the district court's more important rulings on the exclusion of evidence.

## IV. EVIDENCE OF SAFER ALTERNATIVE DESIGNS

■ Evidence of an alternative design of a safer product is admissible and probative to prove design defect in a products liability case. *See, e.g., Mitchell v. Fruehauf Corp.*, 568 F.2d 1139 (5th Cir.1978); *Miller v. Bock Laundry Machine Company*, 568 S.W.2d 648 (Tex.1978); *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975); *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

Appellant contends that the single piece wheel, "was and is an alternative design of a safer product than the multi-piece wheel." Appellant's Brief at 4. Pursuant

to this contention, appellant sought to introduce a number of business records tending to show that in 1966, when the Firestone component was manufactured, the single piece wheel was a known, safer alternative. The trial court was inconsistent in excluding some of this evidence. For example, appellant unsuccessfully proffered a 1966 report by Firestone's chief engineer of truck tire design entitled "Tubeless Truck Tire Safety," which read in part:

### TUBELESS TRUCK TIRE SAFETY

In accordance with your request for a summary of our experience in tubeless truck tire safety, the following reasons have been proven through many years of tubeless experience and are primary reasons for considering the tubeless a much safer tire.

. . . .

*Item #2—No Lock Ring Hazards* —The one piece tubeless drop center rim does not present any mounting or inflating hazards. The tubed tire with multi-piece rim has caused many accidents due to improper assembly, improperly seated, damaged or misfitted side rings and lock rings. These have caused many accidents.

Plaintiff's Exhibit 27, at 1. These statements, if credited by the jury, would certainly tend to show that at the time Firestone manufactured the multi-piece rim at issue here, the single piece rim was a viable, safer alternative—and was known to be so by Firestone's top engineers.

One of appellees' major claims regarding single piece rims is that tubeless tires, which are necessary for such rims, are not a practical alternative tire. For example, appellees quote appellant's expert as saying that the tube-type tire involved in the accident "could not have been mounted on a single-piece rim: 'This doesn't have the flexibility to permit it to be put on a single-

---

**10.** *See, e.g.,* 14 Rec. at 693–94:

I ... want to reiterate the effect of my ruling in limine about other accidents. Counsel for plaintiff seems particularly to be persisting in raising other accidents, and I will not tolerate in front of the jury these repeated references to other accidents. We're here to try the facts of this case and not other cases.

piece base.'" 13 Rec. at 508. Appellees then conclude triumphantly that "Plaintiff's expert therefore established that the single-piece wheel was not a feasible alternative for users of tube-type tires." Appellees' Brief at 23. *But of course* tube-type tires require multi-piece rims; the issue is whether single piece rims—and their accompanying tubeless tires—were a viable alternative when the multi-piece components in this case were manufactured.

The above-cited Firestone safety report discussed tubeless tires as follows:

*Item # 1—Fewer Road Delays*—Tubeless tires have ⅓ to ⅒ as many road delays per tire as tubed tires on the same fleet. These have been documented on our fleets, including Greyhound. This results in fewer trucks being stranded on the highway for tire service and also means that there are fewer tires suddenly going flat at high speeds on the highway.

. . . .

*Item # 3—No Tube and Flap Problems*—[describing "very dangerous failures which would not have been caused if drop center tubeless tires were used."]

. . . .

*Item # 4—Tire Fires Eliminated*—Experience has shown that tire fires caused by tubeless tires are extremely uncommon. . . .

. . . .

*Item # 5—Industry Status*—

. . . .

We believe that the majority of the major tire companies are in favor of tubeless truck tires as the safest and most economical tire for the future. Our experience on tubeless tires on mileage operations has been very favorable, and tubeless tires are specified for all new equipment for our mileage account.

Plaintiff's Exhibit 27, at 1, 2. In fact, nowhere in his safety report does Firestone's chief truck tire engineer mention *any* drawbacks at all for tubeless tires or single piece rims.

After hearing arguments of counsel the trial court excluded Plaintiff's Exhibit 27, along with about a dozen other such documents, on the following grounds:

I am going to make the following rulings on the documentary evidence tendered yesterday by the plaintiff. I am going to grant or sustain the objections of the defendants to all of those documents that relate to single-piece rims because I do not believe that that evidence is relevant to any of the issues in this case. . . .

15 Rec. at 736. Evidently, the court had little patience for plaintiff's alternative design theory. As intimated in the order *in limine*, such evidence was simply considered "irrelevant." [11]

As noted previously, however, the argument from alternative design is an accepted theory of recovery under Texas products liability law. The court in *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex.1980), for example, declared that

A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative. Thus, evidence of the actual use of, or capacity to use, safer alternatives is relevant insofar as it depicts the available scientific knowledge and the practicalities of applying that knowledge to a product's design. This method of presenting evidence of defective design is not new to the Texas law of product liability. *See, e.g., Rourke v. Garza*, 530

---

**11.** *Cf.* 17 Rec. at 1239 (sustaining objection to cross-examination of defendants' witness, who had testified to alleged dangers of single piece rims, with: "I've told you I'm not letting in the evidence on a single rim. We're not trying a single-rim lawsuit here, and I am going to sustain the objection on relevance.").

*See* Fed.R.Evid. 401: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

S.W.2d 794 (Tex.1975); *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex. 1974); *Williams v. General Motors Corp.*, 501 S.W.2d 930 (Tex.Civ.App.— Houston [1st Dist.] 1973, writ ref'd n.r. e.); *Hartzell Propeller Co. v. Alexander*, 485 S.W.2d 943 (Tex.Civ.App.— Waco 1972, writ ref'd n.r.e.); *Pizza Inn, Inc. v. Tiffany*, 454 S.W.2d 420 (Tex.Civ. App.—Waco 1970, no writ).

*Id.* at 746. Similarly, in *Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.1982), the court allowed plaintiff to present extensive testimony on other makes of cars in order to pursue a safer alternative design theory. Indeed, one might fairly say that in *Nowak* the debate centered as much on the competing gear mechanisms of GM and Chrysler as on the litigated one manufactured by Ford. *See id.* at 588–89.

Thus, far from being "irrelevant" to appellant's case, the evidence on single piece rims and tubeless tires was central to appellant's alternative design argument, which is an accepted theory of recovery under Texas products liability law. To be sure, appellant was allowed to go into this with her expert witness and to do considerable cross-examination on the matter. But the trial court was inconsistent in excluding some of this evidence.[12] The harm to appellant's case lay in what the excluded evidence would have shown about the extent of appellees' knowledge of the magnitude of the danger and the magnitude of the difference in safety when the two designs were compared.

## V. EVIDENCE OF THE INDISTINGUISHIBILITY OF SIMILAR PRODUCTS

█ As noted previously, appellant contends that the accident occurred, at least in part, because the Firestone rim base had been mismatched with a Goodyear side ring. A proper match would have been a Firestone rim base and a Firestone side ring, *or* a Goodyear rim base and a Goodyear side ring. The fact of a mismatch points to neither component as being the "wrong" or "defective" one. If they are unreasonably or dangerously liable to be mismatched, then they are both to that extent "defective." Whether a product is defective in this sense thus depends on what *other* products look like, and how likely they are to be mismatched with it.

If there were only four wheel components in the world—the Firestone rim base and side ring, and the Goodyear rim base and side ring—then the mismatch problem would not be great no matter what they looked like. The true proportions of a "mismatch defect" can be assessed only in relation to the whole range of *potentially* mismatching components, not merely those that were *actually* mismatched in any particular case. The very nature of this defect requires that the jury be allowed to see and compare other potentially mismatching components.[13]

·The trial court below seems to have proceeded on the assumption that the Firestone rim base, the Firestone side ring, the Goodyear rim base, and the Goodyear side ring were the only wheel components relevant to a mismatch theory. In sustaining defendants' objections to an exhibit, the court noted:

The question we are here to decide is the question of particular components that are before the jury, not tire rims or multi-piece tire rims in general.... So I want to emphasize that aspect of the case, that I consider we are here to try

---

**12.** We emphasize that the trial court did not exclude such evidence as "merely cumulative," but rather as *irrelevant*. 15 Rec. at 736; *see also* 17 Rec. at 1239. Another implied ground of inadmissibility—that the documents postdated manufacture of the components at issue—is discussed in a following section.

**13.** Under Texas products liability law the task of determining whether a product is "unreasonably dangerous" is a process of balancing the product's risk against its utility. *See Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 530 (Tex.Civ.App.1979) (citing *Hopkins* and *Turner*). There is considerably more risk associated with a wheel component that can be mismatched with any number of other components than there is with a component that can be mismatched with only one other component.

defects in these particular products, not multi-piece rims in general....

13 Rec. at 425–26. Later, in sustaining a similar objection the court instructed the jury as follows: "Ladies and Gentlemen, you won't consider testimony about any other components other than involved in this case for any purpose." *Id.* at 459.

A good example of appellant's difficulties in presenting her "mismatch" argument is to be found in the testimony concerning the Goodyear side ring. Plaintiff, of course, was attempting to demonstrate that the component could be confused with other side rings, so that it—rather than the proper, matching Firestone side ring— could be mismatched with the Firestone rim base. This theory necessarily involves testimony on those other side rings. Nevertheless, objections to such testimony were repeatedly sustained:

BY MR. RISJORD:

Q. With respect to the Goodyear ring, what is the stamping that you found on it, Dr. Gibson?

A. The Goodyear ring is stamped R8020 LW Goodyear, 1–75F.

Q. Do you as an engineer with the experience and having looked at some eighty-seven of these know what that R means? At least do you as an engineer?

A. Yes, sir.

Q. What does it mean?

A. That means ring.

Q. Is there a ring that is also called simply an R?

A. Yes, there is.

Q. Is this it?

A. No sir, it is not.

Q. Who made that, if you know?

MR. BREES: Excuse me, your honor. We're again getting into other rings and other rims, and we would object on that basis.

THE COURT: What is the question again?

MR. RISJORD: The question is since this ring has the stamping of R on it, I'm wondering whether there are

rings other than this configuration which are R rings.

THE COURT: Sustain the objection.

....

Q. What does the F stand for?

A. I don't know.

Q. On the ring?

A. I don't know.

Q. You don't know?

A. No, sir.

Q. Is there a rim tire which bears the symbol F—

MR. BREES: Excuse me. Same objection, your Honor. Talking now about another rim, another ring.

THE COURT: Sustained.

*Id.* at 459–60, 462.

As an analogy to this restriction on evidence of mismatch, consider the case of a car whose front right wheel falls off in circumstances suggesting that all four wheels were defectively attached. Restricting evidence to the one wheel that actually happened to fall off does not allow the true proportions of the car's defects to be revealed. A car with four defective wheels is more defective than a car with only one defective wheel. In the former case, the fact that it is the front right wheel that happens to fall off is of no particular significance. This does not, however, mean that the requirement of causation can be dispensed with. Rather, an accident caused by the defect would be attributed to failure of "the wheel system." *Cf. Bell Helicopter*, 594 S.W.2d at 529 (characterizing defective product as "the 102 series system").

Similarly, in the case at bar, *if* the Firestone rim base and the Goodyear side ring indeed have a "mismatch defect," that defect cannot consist merely in the fact that these two particular components could be mismatched with each other. Rather, these components are defective because they can be *confused* with other, similar components. This confusion, appellant argues, was one cause of Jackson's accident. The jury should have been allowed to assess the true proportions of whatever "mis-

match defect" these components had, and that can be done only by seeing and comparing other *potentially* mismatching components to determine which of them, if any, are unreasonably and dangerously indistinguishable from the particular components at issue here. In short, the jury should have known whatever the available evidence would show about the similarity of all potentially mismatching multi-piece wheel components.

Appellant's unsuccessfully proffered exhibits suggest that she could have made a credible showing on her mismatch theory, had she been allowed to pursue it fully. For example, appellant even offered evidence tending to show that Firestone's own distributors were having mismatch problems. The minutes of an August 18, 1977, meeting of Firestone distributors contains the following item:

> Distributors are becoming concerned because of the problems involved with mismatching side or lock rings with rims or wheels sold, as the component parts are received in loose loads, even though they are ordered as complete assemblies. The Council Members feel that we should ship all orders for complete assembly with their correct component parts preassembled at the factory. We will take this suggestion under advisement and report our action to be taken.

Plaintiff's Exhibit 147, at 3. This exhibit was excluded; *see* 15 Rec. at 923.

Confusion is further compounded by the fact that in some cases the manufacturers apparently *were* condoning some forms of "mismatch" of their components, while at the same time prohibiting others in the strongest terms. For example, a February 15, 1966, Firestone memo entitled "Interchanging Truck Rim Components" states:

> You have been familiar with the fact that Goodyear Metal Products Division of the Goodyear Tire & Rubber Company have been taking a position through their distributors and direct to truck manufacturers that they would not approve the interchangeability of the Goodyear LBD and Firestone DT rim parts. They have now reversed their position on this matter, and we are attaching a copy of their special bulletin to all Goodyear rim distributors, No. 6642, which was recently sent to distributors. It does not show a date of issue.

Plaintiff's Exhibit 26.[14] This exhibit was also excluded; *see* 15 Rec. at 923.

## VI. EVIDENCE OF SIMILAR ACCIDENTS

Evidence of similar accidents occurring under substantially similar circumstances and involving substantially similar components may be probative of defective design. *See Rush v. Bucyrus-Erie Company,* 646 S.W.2d 298 (Tex.Civ.App.—Tyler 1983, writ ref'd n.r.e.); *Mitchell v. Fruehauf Corp.,* 568 F.2d 1139 (5th Cir.1978); *see also Missouri-Kansas-Texas Railway Co. v. May,* 600 S.W.2d 755 (Tex.1980). Insofar as the trial court's order *in limine* gives abstract expression to these principles it is unobjectionable; but, as applied, the court's order in effect limits "similar accidents" to those involving the Firestone 5° rim base and the Goodyear LW side ring. At trial plaintiff's expert testified that he was not aware of any other accidents involving those exact components. Appellees conclude rather disingenuously from this that "Mr. Jackson's accident was

---

**14.** The earlier Goodyear bulletin had stated:

> Goodyear Metal Products hereby approves the mixing of Goodyear LBD rim parts with Firestone DT rim parts in the 7.50–20 and 22 sizes only. *CAUTION*—This approval is applicable only to Goodyear LBD and Firestone DT rim parts and only with respect to 7.50–20 and 22 sizes.
>
> If any complications arise, we urge you to refer any customers to the vehicle manufacturer from whom the equipment was purchased. Proper coordination can then be handled without burden or further complication to your organization.
>
> It will simply suffice to advise your accounts that Goodyear approves mixing of LBD and DT components in the 7.50–20 and 22 sizes. POSITIVELY NO MIXING OF OTHER RIM TYPES, AND/OR COMPONENTS IS PERMITTED—INDEED IT IS EXTREMELY DANGEROUS.

Plaintiff's Exhibit 167.

unique, and no other accidents were admissible." Appellees' Brief at 27. We decline to take such a narrow and unrealistic view of the matter.

The problem is that the magnitude of the danger of multi-piece rims cannot be proved when the experience with those rims is limited to cases in which an LW ring was put together with a five-degree base. The "substantially similar" predicate for the proof of similar accidents is defined, again, by the defect (or, as we have also termed it, the product) at issue. If the disputed defect were restricted to the mismatch of these two parts, then the trial court's ruling would have been correct. But if that defect is the danger of all multi-piece parts because of the great risk of poor fit, then some proof of other accidents involving multi-piece rims is admissible on the issue of the magnitude of the danger. *See Ramos v. Liberty Mutual Ins. Co.*, 615 F.2d 334, 338–39 (5th Cir. 1980); *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1147 (5th Cir.1978).

Even if we take the duty to warn out of the case, *see* Part X *infra*, we still have negligence and gross negligence. For purposes of proving other accidents in order to show defendants' awareness of a dangerous condition, the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed. *See McCormick on Evidence*, § 200 (E. Clearly 2d ed.1972) (other accidents and injuries in negligence and products liability cases); 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 401[10] (1982) (similar incidents or accidents). Other cases involving multi-piece rims that did not seat and that exploded are sufficiently similar for these purposes. Any differences in the circumstances surrounding these occurrences go merely to the weight to be given the evidence. *See Bailey v. Southern Pacific Transportation Co.*, 613 F.2d 1385 (5th Cir.) (citing *Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394 (5th Cir.1965)), *cert. denied*, 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42 (1980).

The trial court improperly excluded both testimony and exhibits that would have tended to provide evidence of similar accidents. For example, Plaintiff's Exhibit 69 would have provided evidence of a long series of lock ring accidents involving Firestone employees that had occurred at Firestone's own plants, despite extensive safety measures. At trial, Firestone's Manager of Technical Services testified that he devoted at least three-fourths of his time to the evaluation and examination of multi-piece wheels involved in explosions, but the trial court did not allow him to be cross-examined about accidents involving even the type of rim base at issue in this case:

Q. Okay. Well, as a field experienced employee to you as a rim engineer—you at least used to do rim engineering?

A. Yes, sir, very much.

Q. And you have had a lot of field experience in the last six or seven years?

A. I have had a lot of field experience over thirty years.

Q. But the field experience you have been getting over the last six years is after the fact of investigating accidents, isn't it?

A. Generally, yes, sir.

Q. Yes, sir. Well, does that lead you to the conclusion that these parts could be safely used on the job?

MR. MALONEY: Excuse me, Your Honor. Are you talking about just this case or are we talking about in general?

MR. RISJORD: I am talking about the jobs he has experienced.

MR. MALONEY: We object on the basis of relevancy.

THE COURT: I sustain the objection to the question as asked.

Q. (By Mr. Risjord) It is true isn't it that you have evaluated multi-piece ring explosion separations that parts were missing or mismatched?

(MR. KIDDER): Your Honor, I am going to object to that and point the Court to Item 5 of the Pre-Trial Order on the Motion in Limine.

THE COURT: Sustained.

Q. (By Mr. Risjord) What about the 5° parts which you evaluated that have exploded or killed or injured people?

MR. KIDDER: We will object to that.

THE COURT: Sustained.

17 Rec. at 1349–50; *see also id.* at 1354–55; 14 Rec. at 690–91.

Under the principles enunciated in this and the previous sections, *supra,* we hold that such evidence was improperly excluded.

## VII. EVIDENCE POST–DATING MANUFACTURE

■ The trial court below excluded a considerable amount of evidence that post-dated the manufacture of one or more of the specific products in question here. Under a negligence theory an actor is held accountable only on the basis of the knowledge he could, or should, have had at the time he acted; negligence is measured from the actor's perspective and the then foreseeable future. *Boatland,* 609 S.W.2d at 746; *Borel v. Fibreboard Products Corp.,* 493 F.2d 1076, 1088 (5th Cir.1973). Under a strict liability theory, however, the *dangerousness* of a product may be proved as of any time prior to trial.

■ In this case appellant sought to introduce a large number of documents generated by Firestone and Goodyear in the period surrounding the manufacture of their disputed products. While these proffered exhibits may not have been admissible as business records, their very existence among the records would tend to prove knowledge. And most of them should be admissible as admissions because employees of one of the defendant prepared them while acting under instructions and within the scope of employment. (But most of them would be hearsay against the other defendant.)

The trial court took a simple, and to our mind oversimplified, approach to these documents: if they were dated after the date of manufacture of the product at issue, then they were automatically excluded. *See* 15 Rec. at 738–39; *id.* at 920–23. While this approach certainly promotes the cause of efficiency, we think that the overriding goal of justice demands a more sensitive analysis.

Plaintiff's Exhibit 27, referred to previously, provides a good example of this problem. An alternative ground for its exclusion (in addition to "irrelevance") seems to have been the fact that it was dated April 13, 1966, while the Firestone rim base was manufactured in January, 1966. Plaintiff's Exhibit 27; Court's Charge to the Jury, at 9 ("Stipulated Facts"). Thus, after hearing plaintiff's arguments in favor of admitting Exhibit 27, the court remarked:

My recollection is that I ruled in limine in this case that any evidence that post-dated the distribution in commerce of these components would not be admissible without some showing of their relevance ... and it seems to me that the possibility or the likelihood of jury confusion is great when we start talking about things that were known after the manufacture or distribution of these components and for that reason, I am inclined to exclude any evidence that post-dates the distribution of any of these components in the stream of commerce.

14 Rec. at 707–08. This wholesale, blanket exclusion of evidence led to some obviously artificial and unreasonable results. For example, even a cursory examination of Plaintiff's Exhibit 27, the "Tubeless Truck Tire Safety" report by Firestone's chief truck tire engineer dated April 13, 1966, reveals that its frame of reference extends back far before January, 1966, when the Firestone component was manufactured. The opening sentence of the report states that it is being made "[i]n accordance with your request for a summary of our experience in tubeless truck tire safety," and notes that the reasons it advances for considering the tubeless a much safer tire "have been proven through many years of tubeless experience." All the generalizations and summaries made in the report obviously refer back to many years of experience with tubeless tires and single piece rims. Yet,

because it was dated three months too late, the report was excluded.[15]

Clearly, plaintiff's proffered documents tend to show a long and continuous experience with tubeless tires and single piece rims dating back to the early 1950's. The results of that experience must have been substantially available—in some form or another—to Firestone and Goodyear at the time they manufactured the components at issue here. To exclude other documents obviously referring to or reporting on that long history simply because they happen to be dated a few months after manufacture of a component litigated in this case is to give undue and artificial significance to an essentially arbitrary line of demarcation. This we cannot condone.

## VIII. EVIDENCE DEEMED UNDULY PREJUDICIAL

An additional ground for the exclusion of much evidence by the trial court was that its likely impact on the jury would be unduly prejudicial in relation to its probative value. Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Advisory Committee note to Rule 403 adds that evidence tending to "induc[e] decision on a purely emotional basis" is properly excludable on this basis. Photographs of the victim bleeding profusely are classic examples of such evidence.

■ In this case, however, a considerable amount of evidence of a much more cerebral character was excluded on a Rule 403 rationale. For example, as an additional ground for excluding some documents

**15.** Other excluded exhibits would have buttressed the theory that appellees had a long and successful experience with single piece rims and tubeless tires. Some of these documents predated manufacture of the components at issue here by many years, but were excluded nevertheless—apparently because they were viewed by the court as bearing on improper theories of recovery. *See* 15 Rec. at 923. For example, Plaintiff's Exhibit 18, a June 20, 1958, memo from Firestone's home office to its district managers, territory salesmen, and store managers, describes an appended article as "discuss[ing] the many advantages of tubeless tires." The article describes developments in tubeless tires dating back to World War II and states that it was written

> to bring you up to date on our current tubeless tires, and, secondly, to refresh your memory as to the salient reasons why every one of us, down to that most important fellow who changes the tire, should get on the band wagon and build-up customer approval for this wonderful, soundly constructed tire.

Plaintiff's Exhibit 18. This exhibit was excluded; *see* 15 Rec. at 923.

Plaintiff's Exhibit 15 also provides useful context in which to read the exhibits excluded by the trial court on grounds of post-dating manufacture. Plaintiff's 15 is a report entitled simply "Tubeless Tires," by J.J. Robson of Firestone, presented on January 29, 1957, at a National Automobile Association conference. The opening sentence of the report states that "[t]he tubeless tire has now been in full production for three years and we welcome this opportunity to review its performance." Section 2 of the report relates "Field Experience," noting that "[b]y now, the tire industry has produced about 100,-000,000 tubeless tires." *Id.* at 3. Under the heading of "Safety" the report states that "The safety of the tubeless truck tire has been recognized by operators who know the mounting hazard presented by the multi-piece rim used for the tire and tube." *Id.* at 4. This exhibit was excluded; *see* 15 Rec. at 923.

Examples of this genre could easily be multiplied. Plaintiff's Exhibit 13 is a 1955 radio and television script produced by Firestone and stating in part:

> This evening, it gives me great pleasure to announce that Firestone engineers have developed a complete new line of tubeless truck tires and one-piece rims which America's leading truck manufacturers have adopted as standard equipment for their 1956 models....
> With this recognition and endorsement begins a new era in trucking history, a step which means a new high in transportation safety and a new low in truck tire costs.... There is no danger of side rings blowing off.

Plaintiff's Exhibit 13, at 1, 1–2, 3. Plaintiff's Exhibit 12 is a letter from the manager of Firestone's National Account Sales Department dated May 2, 1955, and addressed to large truck fleet operators. One of the reasons given for the positive reception of Firestone's tubeless tires is: "The Firestone one-piece drop center rim is much safer. There are no rim parts to blow off and injure personnel or property." Plaintiff's Exhibit 12, at 2. These exhibits were also excluded; *see* 15 Rec. at 923.

post-dating one of the products, the trial court stated:

> I am not going to admit them because they in many instances have significant potential for prejudice, and some of them, even with that kind of foundation [showing defendants were aware of a safer product at time of manufacture], I doubt that I would admit.
>
> For example, Number 157 is apparently an interoffice memo to Mr. F.A. LePage from M. DiFederico dated May 31, 1979 entitled Proposed Rulemaking, Reference Multiple-piece Rims. In the second paragraph of that memo, he says, "I honestly believe that multiple-piece rims will be outlawed in the future." It seems to me that the business-records exception will swallow the hearsay rule if I can allow someone to put in any opinion they have by putting it down on paper and putting it in a file somewhere.

15 Rec. at 739; *see also id.* at 916. Plaintiff offered to read Mr. DiFederico's deposition and his testimony concerning the document as foundation, and alternatively offered it as an admission against interest—all to no avail. *Id.* at 739–41.

Plaintiff's Exhibit 157 is an inter-office memo from Mario DiFederico, then the President of Firestone, to one of his top executives. It is entitled "Proposed Rule Making Reference Multi-Piece Rims" and states in part:

> I honestly believe that multi-piece rims will be outlawed in the future. My belief in this statement is reinforced by the fact

that an alternative is readily available and, therefore, the standard will not necessarily inconvenience either the manufacturer or the consumer. This naturally wouldn't hurt us, if it were done over a period of time.

While this information is no doubt "prejudicial" to Firestone's cause, it does not strike us as likely to induce an emotional response on the part of the jury, unless righteous indignation be classed as such. On the contrary, DiFederico's memo reveals a very rational and calculated approach to corporate decision-making that a jury should have no difficulty understanding and evaluating. If the jury's reaction is not a favorable one, then Firestone and DiFederico have only themselves to blame.[16]

Equally misplaced in this case is the trial court's concern that "the business records exception will swallow the hearsay rule" if any opinion can be admitted because "someone ... put[s] it down on paper and put[s] it in a file somewhere." 15 Rec. at 739. DiFederico's deposition reveals that he is no ordinary "someone" employed by Firestone. At the time of writing the memo to LePage he had been President of the company for some three years. DiFederico Dep. at 4. Prior to that he had worked his way up the corporate ladder during a 32½ year career at Firestone, much of which involved work on the design, testing, and production of truck wheel rims. *Id.* at 10, 12.[17] Perhaps more than

---

16. It is perhaps worth noting in this connection that DiFederico appears to have been less than forthcoming at his deposition about the subject of the memorandum now labeled Plaintiff's Exhibit 157. Immediately prior to his being confronted with the memo by opposing counsel, the following colloquy ensued:

Q.

....

Now, in '78, 1978, and 1979, before your retirement, sir, you were involved as President of Firestone with monitoring the responses to the proposed rulemaking and regulation by the Department of Transportation, NHTSA, for multi-piece rims, correct?

.... [objections of counsel]

A. When you say when I was involved in, I was not involved. I was not directly involved.

I don't know what you are referring to. I don't really understand what you are referring to.

.... [objections of counsel]

Q. (By Mr. Curtis) Are you aware, Mr. DiFederico, that it was proposed in 1978 by NHTSA that further production of multi-piece rims be banned?

A. I was not aware that they were considering banning it.

DiFederico Dep. at 74–75.

17. *See id.* at 10:

Q. What did you do in the Development Department?

A. I helped design rims, test rims, and improved the rims and the wheels that Firestone made and ultimately made.

anyone else, then, Mr. DiFederico embodied Firestone's corporate decision to manufacture and distribute multi-piece rims of the sort at issue here.

In proscribing by order *in limine* "Any statement during opening argument including references to any 'misrepresentations' or 'dishonesty' of the defendants or the use of terms such as the 'widow maker', the 'suicide wheel' or the 'killer wheel' or the use of other such inflammatory language," the trial court may unwittingly have allowed Firestone to indulge in some rather cynical and inconsistent changes of position. As noted previously, in 1958 the company proudly sent to its district managers, territory salesmen, and store managers copies of an article by Rube Hedlund, entitled "Tubeless Tires: A Progress Report," for use in their marketing efforts. Plaintiff's Exhibit 18. (This exhibit was excluded; *see* 15 Rec. at 923.) The cover letter urged the salesmen to "use all the facts at your command to sell more tires at a better price," and promised that "[b]y reviewing this article, we are sure you will be able to intelligently answer any tubeless tire questions that these prospective tire buyers might ask." *Id.* Both the cover letter and the article itself make prominent mention of the fact that the article was based on statistics supplied by Firestone.

Under the heading "Truck Tubeless" the article states:

> If we want *one* good reason for pushing and endorsing tubeless truck tires, that service court death trap of yours is a simple answer.
>
> We have had one death and several bad accidents in Chicago, due to what I call the KILLER locking rings used on tubed truck tires—which involve 6 separate parts. A tubeless truck tire and wheel assembly only has 2 parts: the tire and the one-piece drop center rim.

*Id.* The final three paragraphs of the article read as follows:

> At your next meeting of your salesmen, service employees, etc., go over the

Q. Can you recall what rims you helped design?

facts pointed out in this article, and be sure to include the boys who change the tires—as they may not be with you long, or might be hospitalized handling those KILLER RINGS.

> You actually are the # 1 Safety Director in your community, so let's stand up and be counted.
>
> I'm so stirred up that it would please me no end if states would pass laws making it illegal to drive with tubed tires. That's how serious I personally feel about our present opportunity and obligation to America's motorists and truckers.

A decade later, Firestone was still avidly cultivating its relationship with Hedlund, as indicated by a July 5, 1968, Firestone memo entitled "Rube Hedlund's Interest in Safety of Loose Flange Rim," which states in part:

> Mr. Hedlund was one of the Press people at our recent Ft. Stockton Show on the LXX tire and wheel.
>
> In a recent telephone conversation with him, he indicated that he was concerned about the lack of safety with loose flange rims, and cited one in the Chicago area which he knew would be the subject of a suit. He would like for somebody to drop around and talk with him about what might be done to improve the safety of rims of this type. I told him that the best thing we knew was to use tubeless tires on 1-piece drop center rims.

Plaintiff's Exhibit 30. (This exhibit was also excluded; *see* 15 Rec. at 923.)

In light of the foregoing, we are forced to take a rather cynical view of Firestone's request for an order *in limine*, which was in fact adopted by the court, proscribing as "inflammatory" the very language it had given its strongest possible institutional support to for years. Apparently, such terms and descriptions are "inflammatory" and "unduly prejudicial" only when they do not suit Firestone's purposes.

A. Oh, all of them....

## IX. APPELLANT'S "INHERENT DANGEROUSNESS" THEORY

As explained in section III, *supra*, appellant's main contention is that the multi-piece wheels at issue here are unreasonably dangerous and thus defective even when their components are not mismatched.[18] This amounts to a claim that these multi-piece wheels are, so to speak, "inherently dangerous" (although we do not insist on that terminology.) Through the exclusion of evidence, and by the nature of the jury instructions, appellant was effectively prevented from pursuing this theory as well.

One of plaintiff's more eloquent and revealing exhibits would have been a memorandum authored by Robert M. Smith, Field Engineering and Technical Services Manager of Motor Wheel Corporation, a wholly-owned subsidiary of Goodyear. Smith's memorandum was prepared in 1973, *see* Smith Dep. at 133; the Goodyear component was manufactured in 1975. Smith's memorandum states in part:

> We make a vital vehicle component which is a metal product with an undefined, but limited, useful life. The parts are inherently dangerous both on the highway and in the shop. When in use the dangerous condition is often masked. We know that these parts, especially old and damaged parts, sometimes catastrophically cease to serve their intended purpose. The time at which the usefulness ceases is dependent on chance, service procedures, maintenance, proper use of tools, and the use, abuse and misuse of which the parts have been subjected during their lifetime. When this happens, there may be a social loss and/or a property loss to the user, the involved user or to interested or disinterested bystanders and a financial loss to Goodyear.

> In the eyes of the user community, the part is a secondary component. It is a sturdy, heavy part, made of steel. He, therefore, thinks it has an unlimited useful life. He does not recognize the possible dangers associated with the product. There is no significant economic reason to replace an old with a new part, other than tubeless, since there has been no improvement in the state of the art.

> We have expert knowledge with regard to maintenance. Such information is published, but the information may not reach the involved user. If it does, he apparently doesn't see any reason for it. We do not follow up published information with personal contact to show how and the reason why.

> We have expert knowledge with regard to serviceability (possibly negative type of knowledge). Such information is not detailed in our publications. The involved user cannot tell a "good" part from a "bad." He doesn't believe the part won't function (provide support for the tire). He doesn't believe it will endanger him. Even if he feels it is unserviceable, he may not be able to replace it due to owner or his bosses instructions; or a replacement may not be available. He may be willing to take a chance because he can't afford a new rim, or he's in a hurry.

---

18. *See* Plaintiff's Original Amended Complaint ¶ III:

> The Firestone 5° Commander rim base and the Goodyear LW ring were defective in their design and/or manufacture and/or marketing in that their design was such as to allow explosive disassembly and mismatch with parts not suited for said purpose, all of which Defendants knew and anticipated, resulting in an unreasonably and highly dangerous assembly of which Defendants failed to instruct or warn, or failed to give adequate instruction or warning, so that Defendants Firestone and Goodyear are negligent and strictly liable to Plaintiff.

*See also* Pre-Trial Order, Contested Issues of Fact, no. 1:

> Whether the Firestone 5° Commander rim base or the Goodyear LW ring or both were negligently or defectively designed and/or manufactured because they failed to provide a positive lock and because they permitted mismatch either or both [of] which design deficiencies gives each part the proclivity to explode during anticipated or foreseeable use, which was, jointly or separately, a proximate and/or producing cause of the accident in question.

Plaintiff's Exhibit 68; *see also* Smith Dep. at 132–53. In the course of an extensive offer of proof covering some 15 pages in the record, *see* 13 Rec. at 426–41, plaintiff offered portions of Smith's deposition as foundation for the memorandum, offered the exhibit alternatively as an admission against Goodyear or a Goodyear business record, and even put a Motor Wheel engineer on the stand to substantiate portions of the exhibit. Still, the trial court declined to admit the document, stating as before:

> I think the possibility of prejudice far outweighs any probative value the document has. The question we are here to decide is the question of particular components that are before the jury, not tire rims or multi-piece rims in general, and that's all this Plaintiff's Exhibit 68 discusses, is problems with tire rims in general.

*Id.* at 425–26; *see also* 15 Rec. at 916.

The trial court wholly failed to submit to the jury an issue on whether the wheel components were defectively designed because of a proclivity to explode, even when not mismatched, under normal or foreseeable use. Instead, appellant's design defect claims were reduced to the following interrogatory:

> Do you find that, at the time it was manufactured, Firestone's 5° rim base could be mismatched with a Goodyear LW side ring and that such mismatch, if any, constituted a defective design?

Court's Charge to the Jury at 16, Question No. 1. (Question No. 3 simply mirrored No. 1 by transposing the names of the two components.) We note in passing that this interrogatory does not even do justice to appellant's mismatch theory since, consistent with the trial court's limited interpretation of that theory, the interrogatory asked the jury to determine only whether the individual component pieces could be mismatched *with each other.*

The trial court also submitted interrogatories on negligence in design to the jury, but these negligence interrogatories too were couched solely in terms of a mismatch theory. *See id.* at 29–30. Thus one whole causal explanation for the accident was left unexplored.

This case is a classic demonstration of two ships (lawyers for the plaintiff and the trial judge) passing in the night. The trial judge saw the case (ruled on the evidence and submitted it to the jury accordingly) as if the only issue were the mismatch of the Firestone 5° rim and the Goodyear LW ring. This was not plaintiff's contention—either as stated in the pretrial order or as argued throughout the trial. The central defect litigated in this case was the likelihood that multi-piece rims would not fit together: their proclivity for explosive disassembly. It was a danger that users could not detect or be expected to know of. Such a precise fit was required to avoid explosion that many circumstances could interfere with that precise fit.[19] The trial judge's misapprehension of plaintiff's case is obvious in all of his rulings and in the special interrogatory submission, where product liability is predicated on interrogatories as to whether the five degree base, or the LW ring, could be mismatched with the other and if *that mismatch* constituted a defective design. Plaintiff lost this case in the submission, objected to these issues,[20] and raises the point on appeal.[21]

Through the exclusion of powerful and probative documentary evidence, and by the nature of the court's charge, appellant was effectively precluded from making her case to the jury on an essential theory of

---

**19.** Incidentally, we have the feeling that Mr. Gerbeth of the Goodyear company saw it this way too. When being asked about the relative safety of the single rim and the multi-piece rim, he always qualified his answer by saying that if the components used were "serviceable" and properly mounted, one design was as safe as the other. But it seems clear that he thought the single rim was the much safer design because of

the enormous potential for error in getting that precise fit (i.e. a "proper" mount of "serviceable" parts) between the multi-pieces. *See, e.g.,* 18 Rec. at 1486, 1493–94.

**20.** *See id.* at 1612–13.

**21.** *See* Appellant's Brief at 2–3, 4–5, 15.

recovery. We conclude that this constitutes reversible error.

## X. INSTRUCTIONS ON REMAND

■ Plaintiff advanced essentially four theories of recovery: (1) Defective design, under a strict liability theory; (2) Negligence in design; (3) Failure to warn, under both strict liability and negligence; (4) Gross negligence meriting punitive damages. We remand this case for a new trial on the first, second, and fourth theories.

We remand on defective design and negligent design because, as explained in detail *supra*, the trial court improperly excluded evidence, exhibits, and testimony, and improperly instructed the jury, on those theories.[22] We find no such infirmities in the court's treatment of the "failure to warn" issue and thus leave the jury's findings on that theory intact.

We remand on gross negligence because the jury's finding on ordinary negligence may have been infected by the improper exclusion of evidence and improper instructions, as we have amply indicated above, and because the trial court predicated its interrogatory concerning gross negligence in design (and the assessment of punitive damages) upon a finding of ordinary negligence in design. *See* Court's Charge to the Jury, Questions 18–19; *see also Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981). We do not suggest that the submission of gross negligence *cannot* be conditioned on a finding of ordinary negligence; here, however, reversal of the denial of punitive damages is required because the trial court erroneously excluded evidence and erroneously limited the negligent design theory of recovery.

## XI. CONCLUSION

A common thread in our disagreements with the trial court's procedures detailed above is our greater confidence in the jury's ability to assess and evaluate competing claims. In an earlier era such confidence might not have been warranted. But today our citizens face, and deal on a daily basis with, a constant barrage of extravagant and conflicting claims in such diverse realms as politics, advertising, science, and technology. Perhaps as never before, ordinary citizens are now forced as a matter of course to come to terms with sharply divergent claims to their allegiance, many of which come cloaked in the garb of scientific testimony or involve issues highly charged with emotional content.

In addition, our confidence in the jury's ability is bolstered when the issues presented for decision are relatively straightforward and well within the competence of the ordinary juror. Although most jurors are probably not aware of the hazards of exploding wheel rims, the underlying principles can readily be grasped once they have been explained, and the potential for seriously misleading, prejudicing, or confusing the jury is correspondingly smaller. Juries of today may not know much about securities and exchange law, the law of income taxation, or many other fields of law, but one must be confident that they are relatively familiar with truck tires, wheels, and the like. In these circumstances the proper presumption is that the jury should have available to it a full range of information when making its decision, not that it must be shielded and protected from such information.

Accordingly, we REVERSE IN PART and REMAND to the district court for a new trial.

---

**22.** We are not persuaded that the jury's finding of 100% contributory negligence is conclusive of these issues on appeal. First, we note that the jury was required to apportion 100% of the "contributions" Jackson, Firestone, and Goodyear made to the accident. Court's Charge to the Jury, Question 34; *see Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984). In concluding that Jackson contributed 100% to the accident, the jury was, in effect, finding that Firestone and Goodyear contributed 0%. That finding, in turn, may itself have been infected by the improper exclusion of evidence and the improper instructions that we have discussed in detail above. Thus, the interrogatory directed to contributory negligence is essentially meaningless.

The Petitions for Rehearing are DENIED and no member of this panel nor judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Federal Rules of Appellate Procedure and Local Rule 35) the Suggestions for Rehearing En Banc are DENIED.

Judge GARWOOD concurs in the result.

Louis M. Phillips, Taylor, Porter, Brooks & Phillips, John R. Tharp, Baton Rouge, La., for plaintiffs-appellants.

Edwards, Stefanski & Barousse, Homer Ed Barousse, Jr., Crowley, La., for Seale.

C. James Gelpi, New Orleans, La., for Odom.

F. Jefferson Millican, Jennings, La., for Lyons.

Charles J. Boudreaux, Pugh & Boudreaux, Lafayette, La., for Broussard and Boudreaux.